UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------X

MEIJER, INC. and MEIJER DISTRIBUTION, INC.,
     2929 Walker Ave., NW
     Grand Rapids, MI 49544,

                    Plaintiffs,

     v.

ASTRAZENECA PHARMACEUTICALS L.P.;
ASTRAZENECA L.P.; ZENECA, INC.; and
ZENECA HOLDINGS, INC.,

                    Defendants.

-------------------------------------------------------------X

CASE NUMBER 1:06CV02155

JUDGE: Richard W. Roberts

DECK TYPE: Antitrust

DATE STAMP: 12/18/2006

**NOTICE OF APPEARANCE
OF CO-COUNSEL**

     PLEASE TAKE NOTICE that the law firm of Kaplan Fox & Kilsheimer LLP, 805 Third

Avenue, New York, NY 10022, telephone: (212) 687-1980, hereby enters its appearance as co-

counsel for plaintiffs Meijer, Inc. and Meijer Distribution, Inc. in the above-referenced matter.

All future pleadings should be served upon Kaplan Fox & Kilsheimer LLP at the above-

referenced address, in addition to all other counsel who have previously appeared on behalf of

Meijer, Inc. and Meijer Distribution, Inc.

Dated: January 31, 2007

                              Yours, etc.

                              KAPLAN FOX & KILSHEIMER LLP

                              By: */s/ Robert N. Kaplan*
                                 Robert N. Kaplan
                               Richard J. Kilsheimer
                           805 Third Avenue, 22nd Floor
                           New York, NY 10022
                           Tel: (212) 687-1980
                           Fax: (212) 687-7714
                           E-mail: rkaplan@kaplanfox.com

                           Co-Counsel for Plaintiffs Meijer, Inc.
                            and Meijer Distribution, Inc.



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MEIJER, INC. and MEIJER DISTRIBUTION, INC.,**
    **2929 Walker Ave., NW**
    **Grand Rapids, MI 49544,**

                       **Plaintiffs,**

           **v.**

**ASTRAZENECA PHARMACEUTICALS L.P.; ASTRAZENECA L.P.; ZENECA, INC.; and ZENECA HOLDINGS, INC.,**

                   **Defendants.**

CASE NUMBER  1:06CV02155

JUDGE: Richard W. Roberts

DECK TYPE: *ANTITRUST*

DATE STAMP: 12/19/2006

:
:
:
:
:
:
:
:
:
:
:

**JURY TRIAL DEMANDED**

Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. ("Plaintiffs"), by and through their undersigned attorneys, hereby bring this action on behalf of themselves and the class defined below under the United States antitrust laws against Defendants AstraZeneca Pharmaceuticals L.P., AstraZeneca L.P., Zeneca, Inc., and Zeneca Holdings, Inc. (collectively, "Defendants") and demand a jury trial:

## NATURE OF THE ACTION

1.     This is a civil class action seeking treble damages arising out of Defendants' unlawful monopolization and attempted monopolization of the market for omeprazole and its enantiomers, including the prescription drugs Prilosec, Nexium, and any AB-rated generic equivalents of either. Defendants orchestrated an anticompetitive scheme that

1

involved converting the market from Prilosec, which is subject to competition from generic versions of the drug, to a virtually identical drug, Nexium, which is not.

2.     Defendants implemented this product switch at considerable expense solely to impair generic competition and thereby maintain Defendants' monopoly power. Defendants' unlawful conduct has deprived Plaintiffs and others similarly situated of the benefits of effective generic competition from December, 2002 through the present.

3.     Plaintiffs bring this action on behalf of themselves and a class of direct purchasers of branded omeprazole/esomeprazole drugs from Defendants. Defendants' anticompetitive scheme allowed them to charge supracompetitive prices for branded omeprazole/esomeprazole, causing plaintiffs and members of the class to pay overcharges on their purchases.

## PARTIES

4.     Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer") are corporations organized under the laws of Michigan, with their principal place of business in Grand Rapids, Michigan. Meijer is the assignee of the claims of the Frank W. Kerr Co., which, during the Class Period, as defined below, purchased the drugs at issue directly from one or more Defendants.

5.     Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware. AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

2

6.      Defendant AstraZeneca L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware.

7.      Defendant Zeneca, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

8.      Defendant Zeneca Holdings, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

9.      The Defendants identified above will be referred to collectively as "Defendants" or "AstraZeneca."

## JURISDICTION AND VENUE

10.     This Complaint brings a civil antitrust claim arising under section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has subject-matter jurisdiction over the claim pursuant to 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each Defendant is an inhabitant of this District or is found or transacts business here.

## TRADE AND COMMERCE

12.     The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

## CHARACTERISTICS OF PHARMACEUTICAL MARKETS

13.     The sale of pharmaceutical products in the United States suffers from a significant market imperfection that can be exploited by manufacturers in order to obtain or maintain monopoly power with respect to the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to buy. When the person who chooses the product also pays for it, the price of the product plays an appropriate role in the buyer's choice of product and, correspondingly, the manufacturer of the product has an appropriate incentive to lower its price.

14.     The pharmaceutical industry is characterized by a "disconnect" between the payment obligation and product selection. State laws prohibit pharmacists from dispensing many pharmaceutical products, including omeprazole, without a prescription from the patient's physician. This prohibition on dispensing certain drugs without a prescription creates a disconnect between the payment obligation and product selection. The patient (and in most cases his or her insurer) has the obligation to pay for the product, but the patient's physician chooses which product the patient will buy.

15.     The relative unimportance of price in pharmaceutical markets reduces what economists call the price elasticity of demand – the extent to which sales go down when price goes up – which in turn gives brand manufacturers the ability profitably to raise price substantially above marginal cost. This ability is referred to by economists and antitrust courts as market or monopoly power. Thus, one result of the market imperfections and market structure described above is to allow manufacturers of branded prescription pharmaceuticals to achieve and maintain monopoly power.

4

16.     Some pharmaceutical manufacturers seek to exploit this defect in pharmaceutical markets. Brand manufacturers (*i.e.*, the manufacturers of branded, as opposed to generic, pharmaceuticals) employ large forces of sales representatives, known as "detailers," who visit physicians' offices in an effort to persuade physicians to prescribe the manufacturer's products. These detailers do not advise physicians of the cost of the manufacturer's products. Studies show that physicians typically are not aware of the relative cost of branded pharmaceutical products and that, even when physicians are aware of relative cost, they are insensitive to price differences because they do not themselves have the obligation to pay for the products. The result is that price plays a negligible role in product selection between branded prescription pharmaceuticals.

17.     Manufacturers of generic prescription pharmaceuticals ("generic firms") market their products differently. Rather than exploit the market defect by marketing their products to doctors, generic firms market their products to pharmacies based principally on price. *See* Drug Product Selection, Staff Report to the FTC (Jan. 1979) ["FTC Staff Rep."] at 49-50; A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION DRUG PRICES: ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS ["Generic Substitution"] at 5 (FTC 1985). A generic firm cannot profitably promote a generic product to doctors because the firm would have no assurance that a pharmacist would dispense its generic product rather than another's. It is thus economically infeasible for generic firms to exploit the price disconnect by promoting products to doctors, so the firms must try to increase sales by offering low prices to pharmacies.

## THE ECONOMIC RATIONALE FOR GENERIC SUBSTITUTION LAWS

18.     Congress sought to ameliorate the price disconnect in pharmaceutical markets, and restore some normal competitive pressures to those markets, by authorizing the manufacture and sale of generic pharmaceuticals.  State legislatures continued this policy by mandating or permitting generic substitution by pharmacists without physician approval.  When a pharmacist receives a prescription for a branded pharmaceutical product, and a generic version of that product is available, state law permits (or in some cases requires) the pharmacist to dispense the generic product instead of the branded product.  In this way, the importance of price is reintroduced to the product selection decision at the pharmacy counter.  When generic versions of a brand-name drug become available, the branded manufacturer loses its ability to exploit the market imperfection, its monopoly power dissipates, and some normal competitive pressures are restored.

19.     Today, all 50 states have Drug Product Selection ("DPS") laws that permit or require a pharmacist to dispense a generic drug in lieu of a brand drug whenever possible.  These DPS laws are premised on the economic fact that brand companies exploit the market defect by promoting to doctors and that generic firms are unable to do so and therefore promote their products by offering low prices to pharmacies:

> Since physicians are an unlikely force behind a switch to lower-cost brands after the patent period has expired, an erosion of the patent-conferred monopoly must depend on others who have both the power and the incentive to respond to lower prices. That is the role envisioned for the drug product selection laws: to transfer some of this power to pharmacists. Consumers are the ones most interested in a lower price, and pharmacists must respond to consumer demand because of direct competition with other pharmacies on prescription prices.

Generic Substitution at 7.

20.    DPS laws "shift the choice of [drug product] for most prescriptions from the physician to the pharmacist." *Id.* As the FTC Report put it, "the laws foster price competition by allowing the only principals who have financial incentives to make price comparisons – the pharmacist and the patient – to select drug products on the basis of price." FTC Staff Rep. at 7.

### STATE AND FEDERAL PROMOTION OF GENERIC ENTRY

21.    Based on this economic rationale, it became State and national policy to encourage generic substitution for branded drugs. Working together, the Federal Trade Commission ("FTC") and the Food & Drug Administration ("FDA") in 1979 developed a Model Drug Product Selection Act ("Model Act") for State legislatures to enact. *See* FTC Staff Rep. at 273. The Model Act permits pharmacists to dispense a generic unless the doctor specifies that the brand is medically necessary. The FTC and FDA were "committed to facilitating drug product selection [*i.e.*, generic substitution]," and believed "that effective drug product selection laws will work to stimulate price competition in a multi-source prescription drug market." *Id.* at 291.

22.    The FDA also helped promote generic substitution by developing a list of
therapeutically equivalent, generic drugs that could be safely substituted for branded products
(today called the "Orange Book," because of its color).  The purpose of the FDA's list was to
"enhance the ability of drug purchasers to recognize and take advantage of opportunities for
direct savings by drug selection."  Rules and Regulations, Dept. of Health and Human Services,
Food and Drug Admin., Therapeutically Equivalent Drugs; Availability of List, 45 F.R. 72582
(Oct. 31, 1980) at 41.  This list helps make drug products "sufficiently interchangeable so that
price can be a major factor in their selection."  Office of Technology Assessment, Drug
Bioequivalents, at 57 (July, 1974).

23.    The first generic competitor to enter a market typically does so at a price at
least 30% lower than the price of the equivalent brand-name drug and quickly takes a substantial
amount of market share away from the brand-name manufacturer.  As additional generic
competitors come to market, the price of the generics continues to fall, and their combined
market share continues to grow.  In many cases, generic competitors sell products equivalent to
brand-name prescription drugs for as little as 10% of the price of the brand-name drug, and have
captured as much as 90% of the brand-name drug's pre-generic sales.

24.    The price competition engendered by generic pharmaceuticals benefits all
purchasers of the drug, at all levels of the distribution chain, who are able to buy the same
chemical substance at much lower prices.

**FEDERAL REGULATION OF NEW PHARMACEUTICAL PRODUCTS**

25.    The federal administrative efforts to encourage generic substitution were
ratified by Congress in 1984 with the enactment of the Hatch-Waxman Act.  As discussed below,

8

that Act speeded generic entry by easing the FDA approval process.

26.    Under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, approval by the FDA is required before a new drug may be sold in interstate commerce. Premarket approval for a new drug must be sought by filing a new drug application with the FDA, under either section 355(b) or section 355(j) of the Act, demonstrating that the drug is safe and effective for its intended use.

27.    In 1984, Congress amended the Food, Drug and Cosmetic Act by enacting the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act. The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need for generic firms to file lengthy and costly New Drug Applications ("NDAs") in order to obtain FDA approval. Instead, such firms are permitted to file Abbreviated New Drug Applications ("ANDAs") and to rely on the safety and efficacy data already supplied to the FDA by the brand-name manufacturer. The Hatch-Waxman Act also added a number of patent-related provisions to the statutory scheme, as described below. Congress's principal purpose in enacting the Hatch-Waxman Act was "to bring generic drugs onto the market as rapidly as possible." *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

28.    New drugs that are approved for sale by the FDA are sometimes protected by a patent or patents, which provide the patentee with the (conditional) exclusive right to sell that drug in the United States for the duration of the patentee or patents involved, plus any extensions. Under 21 U.S.C. § 355(b)(1), a patentee seeking FDA approval for a new drug is required to file with the FDA the patent number and expiration date of any patents that claim the

drug for which the applicant seeks approval.

29.     An applicant filing an ANDA for a generic version of a brand-name drug must certify to the FDA that one of the following conditions is satisfied: (1) the brand-name manufacturer has not filed patent information with the FDA (a "paragraph I certification"); (2) the patent or patents have expired (a "paragraph II certification"); (3) the patent will expire on a particular future date, and the generic manufacturer does not seek to market its generic product before that date (a "paragraph III certification"); or (4) the patent is invalid and/or will not be infringed by the generic manufacturer's product (a "paragraph IV certification").  21 U.S.C. § 355(j)(2)(A)(vii).

30.     If a generic manufacturer submits a paragraph IV certification stating that a listed patent is invalid or will not be infringed, it must notify the patentee of the filing and explain why the patent is invalid or will not be infringed.  21 U.S.C. § 355(j)(2)(A)(vii)(IV).

31.     The patentee, upon receiving a paragraph IV certification from an ANDA applicant, has 45 days in which to initiate a patent infringement action against the applicant (a cause of action created by the Hatch-Waxman Act).  If no action is initiated within 45 days, FDA approval of the generic proceeds without regard to patent issues.  If a patent infringement lawsuit is brought within the 45-day window, however, the FDA is automatically barred from granting final approval to the generic applicant until 30 months after the patentee's receipt of the paragraph IV certification, unless the patent expires or is held invalid or noninfringed first.  21 U.S.C. § 355(j)(5)(B)(iii).  This automatic stay of FDA approval is triggered without regard to the merits of the patentee's lawsuit.

32.     The Hatch-Waxman Act and the federal regulations that implement it do

10

not give the FDA authority to resolve issues of patent law. The FDA is required to accept as true information it obtains from patentees and to withhold its approval of new generic drugs whenever the patentee presents a litigated dispute (whether genuine or not) regarding the validity or infringement of a patent.

33.    One result of the statutory and regulatory provisions described above is that brand-name manufacturers have a strong incentive to obtain, list, and enforce patents against prospective generic applicants even if the patent is ultimately held to be invalid or not infringed by the generic drug. If a brand-name manufacturer is able to obtain a patent from the Patent and Trademark Office, list the patent in the Orange Book, and bring actions under the Hatch-Waxman Act to enforce the patent, the brand-name manufacturer can effectively block the entry of generic competition for up to 30 months, and possibly longer. This delay, which is triggered without regard to the merit of the patentee's claim, can be worth hundreds of millions of dollars to the manufacturer of a successful brand-name drug.

34.    FDA regulations also provide a second means for an unscrupulous brand manufacturer to impair generic competition. Under the Hatch-Waxman Act and State regulatory regimes, described above, only generic drugs that have been "AB-rated" by the FDA may be automatically dispensed by the pharmacist in lieu of the brand drug. In order to receive an AB-rating, a generic drug must be: (1) therapeutically equivalent to its brand name counterpart, meaning that the generic has the same active ingredient, form, dosage, strength, and safety and efficacy profile, and (2) bioequivalent to its brand name counterpart, meaning that the generic is absorbed in the body at approximately the same rate as is the branded drug.

35.    An unscrupulous brand manufacturer that expects to experience generic

11

competition to its original product (Product A) can stop promoting that product and start

promoting a virtually identical product instead (Product B). Such a scheme can significantly

impair the ability of a generic version of Product A to compete for all sales of the chemical,

because most physicians – in response to the brand manufacturer's detailing efforts – will stop

writing prescriptions for Product A and the approved generic product will not be substitutable for

Product B. Thus, the brand manufacturer will effectively protect its sales and profits from

generic competition. In order to compete for all sales of the chemical, the generic firm must start

over and submit a new ANDA seeking approval to market a generic version of Product B, which

will add at least several years to the FDA approval process.

36.    As shown in detail below, Defendants developed and marketed Nexium as

part of exactly this kind of generic-impairing scheme. Nexium was not a medical improvement

over Prilosec. But because Nexium was a slight chemical variant of the soon-to-be-approved

generic versions of Prilosec, those generics could not be AB-rated to Nexium. Defendants knew,

based on the economics of the pharmaceutical industry and the AB-rating system, that switching

the market from Prilosec to Nexium would substantially impair competition from generic

Prilosec, and thus allow Defendants to maintain their monopoly. Defendants' exclusionary

conduct allowed them to maintain their monopoly by impairing the generic competition that the

Hatch-Waxman Act was designed to foster.

## OMEPRAZOLE AND ESOMEPRAZOLE

37.    Prilosec is one of a class of drugs referred to as "proton pump inhibitors,"

which are used to treat heartburn and related conditions. The active ingredient in Prilosec is

omeprazole. By 1999, AstraZeneca's sales of Prilosec in the United States exceeded $4 billion,

making it the top-selling drug in the world.

38.    AstraZeneca owned a patent on omeprazole that was issued by the United States Patent and Trademark Office ("PTO") in March of 1981 and, after various extensions, expired in October, 2001. Defendants (or their affiliates) obtained and listed in the Orange Book more than a dozen other patents related to omeprazole. As of October of 2001, however, the active pharmaceutical ingredient in Prilosec was unpatented, leaving Prilosec vulnerable to generic firms that could attempt to invalidate or "design around" the other patents.

39.    Omeprazole is a "racemate," a substance consisting of equal parts of two different physical forms (or isomers) of the same molecule. The two physical forms are mirror images of one another but are otherwise identical. Each form is referred to as an "enantiomer." Esomeprazole is the left-handed or "S" (for "sinister," the Latin word for "left handed") enantiomer of omeprazole. Thus, omeprazole consists of equal parts of the right- and left-handed forms of the molecule, while esomeprazole is the left-handed form.

40.    The FDA approved 20 mg Prilosec capsules in September of 1989, 10 mg capsules in October of 1995, and 40 mg capsules in January of 1998. AstraZeneca began marketing each strength of the drug shortly after receiving FDA approval. From September, 1989 until December, 2002, AstraZeneca was the only manufacturer of prescription drugs containing omeprazole (or any enantiomer of omeprazole) in the United States.

## DEFENDANTS' EXCLUSIONARY SCHEME
## TO IMPAIR GENERIC COMPETITION

41.    AstraZeneca was aware that its best-selling drug would become vulnerable to generic competition in 2001 and, during the mid-1990's, began devising ways to delay or

impair generic competition. AstraZeneca convened a group of marketers, lawyers, and scientists and charged them with finding a solution to the impending patent expiration of the company's best-selling drug. The group called itself the "Shark Fin Project," after the shape that the Prilosec sales chart would trace if Prilosec faced unimpaired generic competition: an inverted V.

42.    The scheme devised by the Shark Fin Project was multifaceted. First, before the onset of generic competition, AstraZeneca would seek and obtain FDA approval for a drug containing esomeprazole as its active ingredient, which, because it used a slightly different form of the molecule, would not be AB-rated to (and thus not subject to substitution by) generic versions of Prilosec. Second, AstraZeneca would engage in an enormously expensive detailing and advertising campaign, using false, deceptive, and misleading claims, to switch existing Prilosec prescriptions to its branded esomeprazole drug (Nexium) and thereby protect those prescriptions from generic substitution. Third, AstraZeneca would effectively withdraw branded Prilosec from the market, cause managed care organizations not to cover the costs of generic Prilosec, and thus drive patients to the much higher-priced Nexium.

43.    This anticompetitive, exclusionary scheme was approved by AstraZeneca and implemented beginning in the late 1990's. The scheme required AstraZeneca to incur massive costs to develop and market a new drug, but AstraZeneca accurately predicted that these costs would be far outweighed by the continued monopoly profits that AstraZeneca would enjoy as a result of impairing generic competition.

44.    AstraZeneca's sole motive in launching Nexium and switching prescriptions from Prilosec to Nexium was to thwart effective competition from generic Prilosec. As members of the Shark Fin Project recognized, of the dozens of potential actions that were

considered to replace the anticipated lost Prilosec sales, launching and switching prescriptions to

Nexium was the worst for consumers. Nexium brought no significant medical benefit to

consumers as compared to generic Prilosec. AstraZeneca also knew that, absent the adverse

effect on sales of generic Prilosec, Nexium was a losing business proposition for AstraZeneca –

the costs of research, development, and marketing of Nexium would not be justified by Nexium

sales. Absent the adverse effect on sales of generic Prilosec, AstraZeneca's development and

marketing of Nexium made no economic sense.

### Defendants' Development of Nexium While Blocking Generic Prilosec

      45.    Anticipating the expiration of Defendants' patent on omeprazole, several

manufacturers of generic drugs filed ANDAs with the FDA seeking approval to market a generic

version of Prilosec upon expiration of the basic omeprazole patent. Each of these applicants

submitted a paragraph III certification with respect to that basic patent and paragraph IV

certifications with respect to the other patents that AstraZeneca had listed in the Orange Book,

stating that these additional patents were either invalid or would not be infringed by their

proposed generic products. Within 45 days of receiving notice of each ANDA filing,

AstraZeneca (or an affiliate) sued each generic firm for patent infringement under the Hatch-

Waxman Act, thereby triggering a stay of regulatory approval on each firm's ANDA.

      46.    These lawsuits were consolidated in the United States District Court for

the Southern District of New York. *In re Omeprazole Patent Litigation*, MDL Docket No. 1291

(S.D.N.Y.) (Jones, J.). After a bench trial in late 2001 and early 2002, the district court ruled that

the relevant patents were valid but were not infringed by the proposed generic product developed

by one of the generic applicants, Kremers Urban Development Co. ("KudCo"). 222 F. Supp. 2d

423 (S.D.N.Y. 2002). KudCo's ANDA was subsequently approved by the FDA and KudCo

entered the market with generic Prilosec in December, 2002, shortly after the district court

decision. The Federal Circuit affirmed the district court's ruling in December, 2003. *In re*

*Omeprazole Patent Litigation*, 84 Fed. App. 76 (Fed. Cir. 2003).

47.    During the delay that resulted from the patent infringement cases filed

against generic firms, Defendants put into effect the strategy developed by the Shark Fin Project

– developing a minutely altered form of Prilosec and converting as much of the Prilosec market

as possible to that product prior to the commencement of generic competition.

48.    The minutely altered form of Prilosec developed by AstraZeneca was

Nexium, which is identical to Prilosec except that Nexium contains esomeprazole rather than

omeprazole as its active pharmaceutical ingredient. As explained above, esomeprazole is the

left-handed form of the molecule, while omeprazole contains equal parts of the left- and right-

handed forms. The two drugs are otherwise substantially identical. Accordingly, when the FDA

approved Nexium in February of 2001, it found that the drug did not contain a new active

chemical entity and refused to reward Nexium with "New Chemical Entity" exclusivity. *See* 21

U.S.C. § 355(c)(3)(D)(ii).

## Defendants' Product Switching Scheme

49.    As compared to omeprazole, esomeprazole offers no significant

therapeutic or other benefit to consumers. AstraZeneca developed Nexium and brought it to

market solely because of its usefulness in AstraZeneca's scheme to impair generic competition.

50.    It is a well known phenomenon in the pharmaceutical industry that doctors

who are in the routine of prescribing Product A will typically not begin prescribing Product B

even if a generic version of Product B becomes available and is thus much less expensive than Product A. This is true even if Products A and B are closely related chemical entities and even if Product A provides no significant medical benefits over Product B. As noted in detail above, doctors are particularly susceptible to brand manufacturer advertising in the form of "detailing." And as also noted in detail above, generic firms are economically precluded from employing large detailing forces.

      51.    This phenomenon provides an opportunity for the manufacturer of two closely related brand-name pharmaceuticals, one of which is vulnerable to generic competition, to shield that product from the full force of generic competition. For example, assume that in Year 1 a brand manufacturer makes sales of 100 units of Product B. The brand manufacturer knows that Product B will face generic competition in Year 3 and that the generics are expected to take 80% of the unit sales, or 80 units. In order to impair that generic competition, the brand manufacturer introduces Product A in Year 1 and directs its detailers to persuade doctors to stop prescribing Product B and instead begin prescribing Product A. Because the same brand manufacturer produces both Product A and Product B, there are no "counter-detailers" to dissuade the doctors from switching from Product B to Product A. In addition, the brand manufacturer can stop providing to doctors free samples of Product B and provide only free samples of Product A. Studies show that providing (or not providing) free samples has a substantial effect on which brand product doctors will prescribe. Through such a strategy, a brand manufacturer can progress from selling 0 units of Product A and 100 units of Product B in Year 1 to, for example, selling 70 units of Product A and 20 units of Product B in Year 3. Thus, instead of having an opportunity to sell 80% of 100 units of Product B, generic firms are limited

to having an opportunity to sell 80% of only 20 units of Product B.

52.    This is exactly the generic-impairing strategy on which AstraZeneca's Shark Fin Project was based.

53.    In 2001, AstraZeneca employed approximately 6,600 detailers to promote its products to doctors. It has been reported that the company hired an additional 1,300 individuals just to detail Nexium. Beginning in March of 2001, these detailers (along with the ones AstraZeneca already employed) blanketed doctors' offices with literature, samples, and promotional material and began urging all Prilosec prescribers to stop prescribing Prilosec and to start prescribing Nexium instead.

54.    Between March, 2001 and the launch of generic omeprazole on or about December 9, 2002, AstraZeneca's sales representatives were aggressively detailing doctors to prescribe Nexium instead of Prilosec based on the claimed superiority of the new drug over the old. AstraZeneca spent approximately $1 billion on detailing and advertising Nexium during the two years after it was introduced.

55.    As part of its detailing effort, AstraZeneca also provided doctors with free samples of Nexium and stopped providing free samples of Prilosec. Doctors typically give free samples of drugs to their patients and simultaneously give the patient a prescription for that drug. By providing samples of Nexium rather than Prilosec, AstraZeneca encouraged physicians to stop prescribing Prilosec and start prescribing Nexium.

56.    Upon the introduction of Nexium, AstraZeneca stopped detailing and promoting Prilosec, despite the fact that Prilosec did not yet face generic competition and would not face such competition for another 18 months. AstraZeneca stopped making positive product

18

claims about Prilosec and, instead, began making negative and false or misleading claims about the effectiveness of Prilosec in treating the conditions for which it is prescribed. AstraZeneca attempted to weaken the competitive position of Prilosec, in favor of Nexium, for the sole reason that doing so would also weaken the competitive position of the anticipated generic versions of Prilosec.

57.    AstraZeneca's strategy was enormously successful in impairing generic competition for Prilosec. In 2000, before the introduction of Nexium, AstraZeneca had U.S. sales of Prilosec of 29.6 million units. With the introduction of Nexium in March, 2001, and with AstraZeneca's determined efforts to switch doctors from Prilosec to Nexium, in 2002 AstraZeneca had U.S. sales of 19.6 million units of Prilosec and 13.4 million units of Nexium. With the introduction of generic omeprazole in December, 2002, AstraZeneca continued its market-switching strategy into 2003. In 2003, AstraZeneca continued to switch sales from Prilosec to Nexium, growing Nexium's unit sales from 13.4 million in 2002 to 18.8 million in 2003 (much of the growth at the expense of Prilosec).

58.    While this product-switching strategy was enormously successful and profitable for AstraZeneca, it was an economic disaster for American consumers. As compared to Prilosec, Nexium provides no significant medical benefits to consumers. Yet, had AstraZeneca not engaged in the product-switching scheme, a minimum of 13.4 million more units of Prilosec would have been available annually – beginning in December of 2002 and continuing until the termination of AstraZeneca's Nexium patents in 2014 – for generic competition. AstraZeneca's product-switching scheme thus has potentially cost direct purchasers of prescription omeprazole and esomeprazole more than $11.5 billion in increased prescription

19

costs.

59.    AstraZeneca's product-switching from Prilosec to Nexium was profitable

for AstraZeneca only because the strategy had the effect of impairing generic competition to

Prilosec. Absent that effect, engaging in the product switch would have made no economic sense

for AstraZeneca. In 2000, AstraZeneca had U.S. sales of 29.6 million units of Prilosec; in 2002,

AstraZeneca had U.S. sales of 33 million units of Nexium and Prilosec combined (an 11.4%

increase). During this same time period, however, the combined U.S. sales of all proton-pump

inhibitors increased from 56.5 million units to 73.9 million units (a 30.8% increase). Thus, sales

in the overall therapeutic category increased at nearly three times the rate as that of combined

Nexium/Prilosec U.S. sales. Thus, AstraZeneca had *less* U.S. sales of Nexium and Prilosec

combined than if AstraZeneca had sold only Prilosec (absent the effect of impairing generic

competition). As AstraZeneca knew when it decided to engage in its scheme, the product

switching caused AstraZeneca to lose the momentum from its prior Prilosec detailing and

advertising efforts and caused some doctors, when asked to switch from Prilosec to Nexium, to

instead switch from Prilosec to a non-AstraZeneca proton-pump inhibitor.

60.    In addition to this loss of sales, AstraZeneca also incurred enormous out-

of-pocket expenses in order to effect the product switch from Prilosec to Nexium. These

enormous expenses, calculated in the billions of dollars, include (but are not limited to) the costs

of research and development to produce and obtain FDA approval for Nexium, incremental

detailing and marketing expenses, stocking allowances paid to retailers to induce them to carry

Nexium, and returned goods allowances paid to wholesalers and other direct purchasers in

connection with the return of unused shipments of Prilosec.

20

61.     AstraZeneca incurred these enormous costs in order to introduce a product that was no better than Prilosec and to make *less* sales of Nexium and Prilosec combined than if AstraZeneca had sold only Prilosec (absent the effect of impairing generic competition). AstraZeneca's product-switching strategy made no economic sense absent its effect of impairing generic competition for Prilosec.

## The Scheme to Mislead Doctors and Patients

62.     To obtain FDA approval for Nexium, AstraZeneca had to test it in clinical trials. Many of the clinical trials used by AstraZeneca to obtain FDA approval of Nexium compared Nexium only with placebos (which is all that is required to obtain FDA approval). But several trials compared Nexium to Prilosec.

63.     AstraZeneca sought FDA approval to market Nexium for three indications: (1) treatment of symptomatic gastroesophageal reflux disease ("GERD"), or common heartburn; (2) treatment of erosive esophagitis; and (3) maintenance of healing of erosive esophagitis. The vast majority of prescriptions for Nexium and other proton-pump inhibitors are written for GERD, or common heartburn. While an estimated 60 million Americans – more than 40 percent of adults – experience symptoms of GERD, less than 2 percent suffer from erosive esophagits, a condition that cannot be diagnosed without the doctor performing an invasive endoscopy.

64.     In an attempt to prove the superiority of Nexium over Prilosec for both common heartburn and erosive esophagitis, AstraZeneca conducted clinical trial No. 172. AstraZeneca scientists concluded that, in order to demonstrate clinical superiority with 95% accuracy (*i.e.,* actual better results for patients in the real world), it would be necessary for the

clinical trial to establish a 10% difference in complete healing rate between Nexium and Prilosec. Clinical trial No. 172 compared the results of the use of each of 40 mg of Nexium and 20 mg of Nexium to the use of 20 mg of Prilosec. The results showed no statistically significant difference between 20 mg Nexium and 20 mg Prilosec in the treatment of heartburn. While there was a slight statistical difference between 40 mg Nexium and 20 mg Prilosec at the four-week mark, that difference disappeared by the eight-week mark. For the treatment of erosive esophagitis, the results showed no statistically significant difference between the use of 20 mg of Nexium and 20 mg of Prilosec. The results showed a small difference (9.7% at 4 weeks and 6.2% at 8 weeks) as between 40 mg of Nexium and 20 mg of Prilosec for the treatment of erosive esophagitis. But the statistical difference did not meet AstraZeneca's own parameters (*i.e.*, a 10% difference) to establish a clinically significant difference.

65.    AstraZeneca performed three additional supportive trials comparing Nexium to Prilosec in the treatment of heartburn: one comparing each of 40 mg and 20 mg of Nexium with 20 mg of Prilosec, another comparing 40 mg of Nexium and 20 mg of Prilosec, and a third comparing 20 mg of Nexium and 20 mg of Prilosec. All three studies failed to show a statistically significant difference as between the use of Nexium and Prilosec to treat heartburn.

66.    In clinical trial No. 173, AstraZeneca compared the use of 40 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive esophagitis. The results showed no statistically significant difference in outcomes for patients.

67.    AstraZeneca also conducted clinical trial No. 174, which compared the use of 20 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive esophagitis. The results showed no statistically significant difference in outcomes for patients.

22

68.    AstraZeneca eventually conducted clinical trial No. 222, which again compared the use of 40 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive esophagitis. This time, however, AstraZeneca increased substantially the number of participants in the trial. Doing so allowed AstraZeneca to reduce from 10% to 5% the difference in complete healing rate between Nexium and Prilosec that would be needed to suggest clinical superiority with 95% accuracy. This time, the results showed a moderate difference: 12% at four weeks and 9% at eight weeks.

69.    The FDA Medical Officer who reviewed the set of clinical studies concluded that "superiority of NEXIUM over omeprazole was not demonstrated." According to the FDA Medical Officer's Review, "a superiority claim of NEXIUM over omeprazole is NOT SUPPORTED by either the comparison of [Nexium 20 mg] vs. [Prilosec 20 mg] or the comparison of [Nexium 40 mg] vs. [Nexium 20 mg]." Summarizing the set of studies, the Review concluded, "There are no studies which demonstrate that [Nexium] is superior to [Prilosec], clinically or even statistically."

70.    In summarizing the medical review, the reviewer noted in a report dated September 21, 2000, that "the sponsor's conclusion that [Nexium] has been shown to provide a significant clinical advance over omeprazole in the first-line treatment of patients with acid-related disorders is not supported by data." The reviewers conclusion reiterated that "it is recommended not to allow the sponsor to claim that esomeprazole magnesium has any significant clinical advantage over omeprazole in the first-line treatment of these acid-related

disorders because no data in support of such a claim have been submitted."[1]

     71.    The FDA accepted the reviewer's recommendation and did not permit

AstraZeneca to assert that Nexium provides a significant clinical advance over Prilosec. In

negotiations between the FDA and AstraZeneca concerning the labeling for Nexium,

AstraZeneca agreed that the clinical trials did not support any claim that Nexium is superior to

Prilosec. In a meeting on February 6, 2001, AstraZeneca's Vice President informed the FDA that

"AstraZeneca is not stating that Nexium is better than omeprazole." AstraZeneca's product

Director stated that AstraZeneca wanted to include the results of the trials in Nexium's product

label in order "to make physicians understand that Nexium is not superior to omeprazole." In

reliance on these assurances, the FDA approved the Nexium product label and the inclusion of

the trial results in the label.

## Defendants' False and Misleading Marketing to Effect the Switch

     72.    Notwithstanding the FDA's conclusion and AstraZeneca's own concession

that the clinical data did not support a claim of superiority of Nexium over Prilosec, AstraZeneca

launched a massive advertising and detailing campaign designed to persuade doctors and

consumers that Nexium was a significant improvement over Prilosec. This false, deceptive, and

misleading campaign was devised by AstraZeneca to impair generic competition to its most

profitable product. AstraZeneca conducted this campaign, despite its enormous cost, in order to

---

[1] In addition to the medical facts outlined above, the economic facts establish that Nexium is not
superior to Prilosec. If Nexium were in fact a superior product to Prilosec, AstraZeneca would
have reflected that superiority in the pricing of Nexium. Instead, rather than pricing Nexium at a
premium to Prilosec, AstraZeneca introduced Nexium at a *lower* price than Prilosec. Once
AstraZeneca had successfully converted the market to Nexium, AstraZeneca raised the price of
Nexium to approximately the same level as Prilosec.

maintain its monopoly position in the market.

73.    The claims made by AstraZeneca to doctors and consumers were false, deceptive, and misleading, and were know to be so, in the following particulars, among others:

    a.    AstraZeneca claimed that Nexium was superior to Prilosec while omitting the fact that the FDA did not approve any claim of superiority of Nexium over Prilosec;

    b.    AstraZeneca claimed that Nexium was superior to Prilosec while omitting the fact that, in order to obtain FDA approval, AstraZeneca assured the FDA that "AstraZeneca is not stating that Nexium is better than omeprazole";

    c.    AstraZeneca claimed that Nexium was superior to Prilosec while omitting the fact that AstraZeneca's own set of studies showed no statistically significant difference in healing rates between Nexium and Prilosec for the most common indication, *i.e.,* common heartburn;

    d.    AstraZeneca claimed the superiority of Nexium over Prilosec with respect to healing erosive esophagitis, but that claim was not supported by the set of studies submitted by AstraZeneca to the FDA, (or by any other set of studies) and, in fact, the studies were included in the product label "to make physicians understand that Nexium is not superior to omeprazole";

    e.    AstraZeneca claimed that Nexium was superior to Prilosec, without limiting the claim of superiority to healing of erosive esophagitis;

f.  AstraZeneca made blanket claims of superiority of Nexium over
Prilosec with respect to healing erosive esophagitis without limiting
the claims to superiority of 40 mg of Nexium as compared to 20 mg of
Prilosec, when in fact AstraZeneca had no study showing clinical
superiority of 20 mg of Nexium over 20 mg of Prilosec;

g.  AstraZeneca made blanket claims of superiority of Nexium over
Prilosec with respect to healing erosive esophagitis without disclosing
that most studies did not support that claim and that the one study that
could have done so was based solely upon a comparison of 40 mg of
Nexium to 20 mg of Prilosec.

## Defendants' Withdrawal of Prescription Prilosec from the Market

74.     AstraZeneca was not content merely to switch the market to Nexium and
let the manufacturers of generic Prilosec fight for the few Prilosec prescriptions that might
continue to be written.  Instead, AstraZeneca effectively withdrew branded Prilosec from the
market.

75.     More than 70% of all U.S. consumers have health coverage provided by
managed care organizations ("MCOs") that pay for some or all of the costs of prescription
pharmaceuticals.  AstraZeneca knew that it is the policy of MCOs covering the vast majority of
consumers to discontinue providing coverage for prescription pharmaceuticals when an over-the-
counter ("OTC") version of a prescription product becomes available.  Although the costs of
OTC medications are thus generally borne by consumers themselves rather than by their insurers,

OTC medications may result in overall lower health care costs. AstraZeneca, however, arranged things differently.

76. On January 27, 2000, AstraZeneca and its OTC marketing partner, Procter & Gamble, jointly applied to the FDA for approval to market Prilosec OTC. Importantly, they sought approval only for short-term (initially 10 day and later 14 day) use of OTC Prilosec even though the quantity of active ingredient in OTC Prilosec and prescription Prilosec (for longer-term use) is the same.

77. On June 20, 2003, the FDA approved the sale of Prilosec OTC. The FDA awarded AstraZeneca three years of exclusivity in the OTC market because of safety studies performed and submitted by AstraZeneca. Thus, AstraZeneca was the only manufacturer of OTC omeprazole until June, 2006.

78. AstraZeneca (through its distributor, Procter & Gamble) began selling Prilosec OTC in September of 2003, approximately ten months after the launch of generic Prilosec.

79. As AstraZeneca knew and intended, upon the introduction of Prilosec OTC in September of 2003, MCOs covering the vast majority of consumers refused to provide coverage for prescription Prilosec because of the availability of the OTC version. As AstraZeneca also knew and intended, the MCOs also stopped providing coverage for *generic* Prilosec. And as AstraZeneca further knew and intended, the MCOs did so even though OTC Prilosec was recommended for use only for 14 days or less.

80. AstraZeneca advises patients who begin therapy on OTC Prilosec, but who need longer-term treatment, to consult their physicians to obtain an appropriate prescription. As

a result of AstraZeneca's conduct, however, patients who consult their physicians and their

MCOs will learn that there is no coverage for prescription Prilosec, whether brand or generic.

The chemically closest product to OTC Prilosec (other than the non-covered Prilosec) is, of

course, Nexium. Thus, a physician writing a prescription for a patient who has started therapy on

OTC Prilosec is likely to write the prescription for Nexium. Moreover, because most MCOs no

longer cover prescription Prilosec, the physician can confer a financial benefit on the patient by

prescribing Nexium rather than advising the patient to continue taking Prilosec OTC or writing a

prescription for Prilosec, both of which would have to be paid for out of the patient's own pocket.

81.     Thus, by obtaining FDA approval to market OTC Prilosec, but only for

short-term use, AstraZeneca simultaneously:  (1) caused MCOs not to cover branded Prilosec and

thus effectively withdrew branded Prilosec from the market; (2) caused MCOs not to cover

generic Prilosec; and (3) drove patients who otherwise would have received less-expensive

generic Prilosec to receive instead a prescription for much more expensive branded Nexium.

82.     AstraZeneca exacerbated the anticompetitive consequences of this aspect

of its scheme by providing an insufficient supply of Prilosec OTC to meet market demand.

Throughout the three-year term of AstraZeneca's OTC market exclusivity, the market was beset

with shortages of the Prilosec OTC supply. As the sole manufacturer of Prilosec OTC,

AstraZeneca was solely responsible for these artificial shortages. In fact, the foreseeable effect of

these shortages was to drive Prilosec OTC patients to see their physicians and obtain a

prescription for Nexium.

83.     The success of this aspect of AstraZeneca's scheme is again seen in the

data on unit sales. In 2003, the combined U.S. sales of branded and generic Prilosec were 15.9

28

million units. In 2004, after the initiation of AstraZeneca's Prilosec OTC scheme in September

2003, the combined sales of branded and generic prescription Prilosec declined to just 9 million

units. A substantial portion of those lost units is accounted for in increased unit sales of Nexium,

which increased from 18.8 million in 2003 to 20.6 million in 2004.

## CLASS ALLEGATIONS

84.     Plaintiffs bring this action under Rule 23(b)(3) of the Federal Rules of

Civil Procedure, on behalf of themselves and the following class (the "Class"):

> All persons and entities in the United States who purchased
> omeprazole/esomeprazole directly from any of the Defendants at any time from
> December 18, 2002 to the present and continuing until the effects of Defendants'
> anticompetitive conduct cease (the "Class Period"). Excluded from the Class are
> Defendants and their parents, employees, subsidiaries, and affiliates, and federal
> government entities.

85.     The Class is sufficiently numerous that joinder of all members is

impracticable. Class members include wholesalers, hospitals, health maintenance organizations,

and/or retail chain drug stores. The Class includes eighty or more members, and the exact

identity of Class members is ascertainable from the records of Defendants.

86.     Numerous questions of law and fact are common to the Class, including:

> a.     whether Defendants willfully obtained and/or maintained
> monopoly power over omeprazole and its enantiomers;
>
> b.     whether Defendants purposefully shifted the market from Prilosec
> to Nexium;

c.      whether Defendants shifted the market from Prilosec to Nexium in

order to maintain their monopoly power;

d.      whether Defendants, or their affiliates or agents, falsely,

deceptively, and/or misleadingly claimed that Nexium was superior

to Prilosec;

e.      whether Defendants engaged in conduct to withdraw prescription

Prilosec from the market;

f.      whether Defendants' conduct impeded the sale of generic

omeprazole in the United States;

g.      whether the acts of Defendants alleged herein have substantially

affected interstate commerce; and

h.      whether, and to what extent, Defendants' conduct caused antitrust

injury in the nature of overcharges to Plaintiffs and the members of

the Class, and if so, the appropriate measure of damages.

87.     These and other questions of law and fact are common to the members of

the Class and predominate over any questions affecting individual members.  Defendants have

acted on grounds generally applicable to the Class.

88.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs

and all Class members suffered antitrust injury by the same wrongful conduct by Defendants.

All Class members have paid artificially inflated prices for the drugs at issue.  The claims of each

Class member arise out of the same nucleus of operative facts and are based on the same legal

theories.

30

89.    Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel experienced in class action and antitrust litigation. Plaintiffs have no interest in this litigation that is adverse to, or in conflict with, the interests of other members of the Class.

90.    A class action is superior to any other available methods for the fair and efficient adjudication of this controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require.  The benefits of proceeding by way of class action, including providing injured persons or entities with a method for obtaining redress on claims that they might not be able to pursue individually, substantially outweigh any difficulties that may arise in the management of a class action.

91.    Plaintiffs know of no difficulty that would be encountered in the management of the claims advanced by the Class that would preclude certification.

## RELEVANT MARKET

92.    To the extent it is necessary to define a relevant market, the relevant product market is the sale of prescription pharmaceutical products containing the omeprazole/esomeprazole molecule – *i.e.*, Prilosec, Nexium, and any AB-rated generic equivalent of either.  The relevant geographic market is the United States.  A firm that was the only seller of such products in the United States could impose a significant, non-transitory price increase without losing sufficient sales to render the price increase unprofitable, as demonstrated by AstraZeneca's ability profitably to charge supracompetitive prices.

31

93.    From the time it introduced Prilosec until December of 2002, AstraZeneca had a 100% share of the relevant market. Thereafter, and solely because of the exclusionary conduct alleged above, AstraZeneca has maintained a market share of at least 70%. But for the exclusionary conduct alleged above, AstraZeneca would have been forced to lower its prices to the price charged for generic omeprazole or its market share after December, 2002 would have fallen precipitously to less than 20%.

94.    At all relevant times AstraZeneca has maintained an ability to price its omeprazole/esomeprazole prescription products substantially above its costs of production. Its prices have exceeded manufacturing costs by approximately 90%.

95.    AstraZeneca's unlawful actions were taken for the purpose of impairing generic competition and allowing it to continue to charge monopoly prices.

## EFFECTS OF DEFENDANTS' UNLAWFUL CONDUCT

96.    Defendants' exclusionary conduct has impaired the sale of generic omeprazole in the United States, and has unlawfully enabled Defendants to sell the omeprazole/esomeprazole molecule at monopolistic, artificially inflated prices. By engaging in such conduct, Defendants have harmed the competitive process and have perpetuated their ability to extract supracompetitive prices from purchasers. But for Defendants' illegal conduct, KudCo and other generic firms would have been able to compete for all sales of the chemical beginning in December, 2002, and Plaintiffs and other purchasers would have benefited from that competition by substituting lower-priced generic omeprazole for all of their purchases of higher-priced Nexium.

97.    There are no procompetitive justifications for Defendants' conduct. The conduct alleged above created no efficiency gains or increases in consumer welfare. On the contrary, Defendants' conduct substantially decreased or eliminated the efficiency gains that would otherwise have occurred through the successful introduction of a less expensive generic version of Prilosec that could be substituted at the pharmacy counter for branded Prilosec -- efficiency gains that Congress and State legislatures intended to bring about when they enacted the Hatch-Waxman Act and State generic substitution laws.

98.    As a result of Defendants' unlawful and exclusionary conduct, Plaintiffs continued to purchase branded omeprazole/esomeprazole from Defendants at monopoly prices rather than generic omeprazole from a generic manufacturer at lower prices. Plaintiffs continue to be overcharged by paying higher prices than would have prevailed in the absence of Defendants' unlawful conduct.

## COUNT ONE
### Monopolization (15 U.S.C. § 2)

99.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

100.    At all relevant times, AstraZeneca has possessed monopoly power in the relevant market.

101.    During the relevant period, AstraZeneca willfully and unlawfully maintained its monopoly power by, *inter alia*: (a) introducing Nexium, a drug virtually identical to and no more effective than Prilosec, solely to prevent generic competitors from competing for all sales of the omeprazole/esomeprazole molecule; (b) engaging in a massive and deceptive

33

advertising and promotional campaign to switch patients from Prilosec to Nexium in anticipation of the entry of generic versions of Prilosec; (c) effectively withdrawing branded Prilosec from the market, causing MCOs not to cover the cost of generic Prilosec, and artificially constricting the supply of Prilosec OTC in order to increase sales of Nexium; and (d) engaging in a unified scheme, including but not limited to the conduct alleged above, to impair generic competition to Prilosec.

102.    Defendants' actions, individually and collectively, were intended to suppress rather than to promote competition on the merits, and have achieved their intended effect.

103.    Plaintiffs have been injured in their business and property by reason of Defendants' unlawful monopolization. Plaintiffs' injury consists of paying higher prices for drugs containing omeprazole/esomeprazole than would have been paid in the absence of Defendants' illegal conduct. Plaintiffs' injury is injury of the type that the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    Certification of this case as a class action;

B.    Judgment declaring Defendants' conduct to be in violation of Section 2 of the Sherman Act;

C.    Judgment in Plaintiffs' favor and against Defendants for damages representing three times the overcharge damages sustained by Plaintiffs and the other members of the Class defined herein;

34

D.    That joint and several judgment be entered against each Defendants in

favor of Plaintiffs and the other members of the Class;

E.    Pre- and post-judgment interest;

F.    The costs of this suit, including a reasonable attorneys' fee; and

G.    Such other and further relief as the Court deems just and proper.

## Jury Demand

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  December 18, 2006                         Respectfully submitted,



Michael D. Hausfeld, D.C. Bar No. 153742
Brian A. Ratner, D.C. Bar No. 473284
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Washington, DC  20005
Tel: (202) 408-4600
Fax: (202) 408-4699

Linda P. Nussbaum, D.C.
Steig D. Olson
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY  10022
Tel: (212) 838-7797
Fax: (212) 838-7745

Joseph M. Vanek
David Germaine
VANEK, VICKERS & MASINI, P.C.
225 W. Washington, 18th Floor
Chicago, IL 60606
Tel: (312) 224-1500
Fax: (312) 224-1510

Paul E. Slater
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 641-3200
Fax: (312) 641-6492

**Attorneys for Plaintiffs Meijer, Inc. and
Meijer Distribution, Inc.**