**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| Meijer, Inc. and Meijer Distribution, Inc., | : |
| | : |
| Plaintiffs, | : |
| | : |
| | : Civil Case Number: |
| v. | : 1:06-cv-02155-RWR |
| | : |
| AstraZeneca Pharmaceuticals L.P.; | : |
| AstraZeneca L.P.; Zeneca, Inc.; | : |
| and Zeneca Holdings, Inc., | : |
| | : |
| Defendants. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MOTION TO DISMISS**
**OF DEFENDANTS ASTRAZENECA PHARMACEUTICALS LP,**
**ASTRAZENECA LP, ZENECA INC., AND ZENECA HOLDINGS, INC.**

Defendants AstraZeneca Pharmaceuticals LP, AstraZeneca LP, Zeneca Inc., and

Zeneca Holdings, Inc. (collectively "AstraZeneca"), by undersigned counsel, respectfully move

the Court pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure to dismiss

the complaints in the above-captioned actions. The grounds for this motion are more fully set

forth in the accompanying statement of points and authorities.

Pursuant to Local Rule 7(f), AstraZeneca hereby requests an oral hearing on this

matter.

A proposed order is attached to this motion.

Dated:  April 6, 2007

Respectfully submitted,

By: ____/s/Mark E. Haddad_____

John W. Treece (*pro haec vice* pending)
David M. Schiffman (*pro haec vice* pending)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
(312) 853-7000
(312) 853-7036 (fax)

Mark E. Haddad (D.C. Bar No. 442547)
Joshua E. Anderson (*pro haec vice* pending)
Alycia A. Degen (*pro haec vice* pending)
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, California 90013
(213) 896-6000
(213) 896-6600 (fax)

*Attorneys for Defendants*

LA1 905358v.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
Meijer, Inc. and Meijer Distribution, Inc.,        )
                                                    )
                              Plaintiffs,           )
                                                    )     **Civil Case Number:**
v.                                                  )     **1:06-cv-02155-RWR**
                                                    )
AstraZeneca Pharmaceuticals L.P.;                  )
AstraZeneca L.P.; Zeneca, Inc.;                    )
And Zeneca Holdings, Inc.,                          )
                              Defendants.           )
                                                    )
                                                    )
_____          )

**STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

John W. Treece (*pro haec vice* pending)     Mark E. Haddad (D.C. Bar No. 442547)
David M. Schiffman (*pro haec vice* pending) Joshua E. Anderson (*pro haec vice* pending)
SIDLEY AUSTIN LLP                            Alycia A. Degen (*pro haec vice* pending)
One South Dearborn                           SIDLEY AUSTIN LLP
Chicago, IL  60603                           555 West Fifth Street
(312) 853-7000                               Los Angeles, California 90013
(312) 853-7036 (fax)                         (213) 896-6000
                                             (213) 896-6600 (fax)

                                             *Attorneys for Defendants*

April 6, 2007

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ................................................................................1

STATEMENT OF FACTS ............................................................................................4

I.      The Products ...................................................................................................4

        A.      Prilosec ..............................................................................................4

        B.      Nexium ................................................................................................5

        C.      Prilosec OTC .....................................................................................8

        D.      Generic Omeprazole ..........................................................................9

II.     The Allegations in the Complaints ................................................................10

        A.      The Plaintiffs ...................................................................................10

        B.      The Alleged Relevant Market ..........................................................12

        C.      The Introduction of Nexium and Prilosec OTC...............................12

        D.      The Allegedly Deceptive Advertising ..............................................13

ARGUMENT ..........................................................................................................16

I.      As a Matter of Law, the Introduction of Nexium Was Not Exclusionary. ........17

        A.      Plaintiffs Cannot State an Antitrust Claim by Alleging That Defendants'
                New Product Was No Better Than Its Existing Product........................19

        B.      Under *Trinko*, This Court Should Not Create an Unprecedented Exception
                That Would Allow Antitrust Challenges to the Introduction of FDA-
                Approved Drugs...................................................................................21

II.     As a Matter of Law, the Introduction of Prilosec OTC Was Not Exclusionary. ...............24

III.    The Allegations of Deceptive Advertising Are Not Sufficient to State an Antitrust
        Claim....................................................................................................27

        A.      The Allegations of Deceptive Advertising Should Be Disregarded Because
                of the Failure to Plead Fraud with Particularity...................................28

        B.      Plaintiffs' Deceptive Advertising Allegations Are Insufficient to State a
                Section 2 Claim....................................................................................31

                1.      The advertising was not "clearly false." ..................................33

**2.**  Any "puffery" in the advertising was not "clearly likely to induce reasonable reliance." ................................................................34

**3.**  Doctors and MCOs are not "without knowledge of the subject matter." ..............................................................................34

**4.**  The advertising of Nexium was "susceptible of neutralization or other offset." ............................................................................35

**C.**  Sherman Act Liability Cannot Be Based on Statements Consistent with the FDA-Approved Label. ...........................................................37

CONCLUSION ..............................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Andrx Pharms., Inc.*,
　　No. 05 C 1490, U.S. Dist. LEXIS 10846 (N.D. Ill. June 3, 2005) ...........................35

*Adamson v. Ortho-McNeil Pharm., Inc.*,
　　No. 06-866, 2007 WL 604790 (D.N.J. Feb. 20, 2007) ...............................................34

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
　　141 F.3d 947 (9th Cir. 1998) .....................................................................................27

*American Home Products Corp. v. Johnson & Johnson*,
　　672 F. Supp. 135 (S.D.N.Y. 1987)..............................................................................39

* [*] *American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal &
Prof. Testing Pubs., Inc.*,
　　108 F.3d 1147 (9th Cir. 1997) ...............................................................................27, 32

*American Society of Certified Podiatric Physicians & Surgeons v. American Board of
Podiatric Surgery, Inc.*,
　　323 F.3d 366 (6th Cir. 2003) ..................................................................................31, 33

*Applera Corp. v. MJ Research Inc.*,
　　239 F. Supp. 2d 338 (D. Conn. 2004).........................................................................32

*Astra Aktiebolag v. Andrx Pharm., Inc.*,
　　222 F. Supp. 2d 423 (S.D.N.Y. 2002), *aff'd sub nom. In re Omeprazole Patent
Litigation*, 84 Fed. Apdx. 76, 2003 WL 22928641 (Fed. Cir. 2003)............................4

*AstraZeneca LP v. TAP Pharm. Prods., Inc.*,
　　No. 04-1332-KAJ, 2006 U.S. Dist. LEXIS 40620 (May 18, 2006)............................27

*Barr Labs., Inc. v. Quantum Pharmics, Inc.*,
　　827 F. Supp. 111 (E.D.N.Y. 1993) .............................................................................31

*Bell Atlantic Corp. v. AT&T Corp.*,
　　339 F.3d 294 (5th Cir. 2003) ......................................................................................16

* *Berkey Photo, Inc. v. Eastman Kodak Co.*,
　　603 F.2d 263 (2d Cir. 1979)...................................................................19, 26, 32, 34

---

[*]  Pursuant to Local Rule 7(a), AstraZeneca has marked with an asterisk the cases and authorities on which it chiefly relies.

*Borsellino v. Goldman Sachs Group, Inc.*,
2007 WL 509385 (7th Cir. 2007) ...................................................28

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...................................................18, 23, 31

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...................................................18

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)...................................................28

\* *California Computer Products, Inc. v. IBM Corp.*,
613 F.2d 727 (9th Cir. 1979) ...................................................19, 26

*In re Canadian Import Antitrust Litig.*,
470 F.3d 785 (8th Cir. 2006) ...................................................38

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993)...................................................34

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*,
885 F.2d 683 (10th Cir. 1989) ...................................................27

*Commonwealth Care Alliance v. AstraZeneca Pharms. LP*,
No. 05-0269 (Mass. Sup. Ct. Oct. 17, 2005) ...................................................30

*Covad Comm. Co. v. Bell Atlantic Corp.*,
398 F.3d 666 (D.C. Cir. 2005)...................................................16, 21

*Cytyc Corp. v. Neuromedical Systems, Inc.*,
12 F. Supp. 2d 296 (S.D.N.Y. 1998)...................................................38

*David L. Aldridge Co. v. Microsoft Corp.*,
995 F. Supp. 728 (S.D. Tex. 1998) ...................................................33, 34

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ...................................................28

*EEOC v. St. Francis Xavier Parochial School*,
117 F.3d 621 (D.C. Cir. 1997)...................................................8

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
703 F.2d 534 (9th Cir. 1983), *overruled on other grounds by Hasbrouck v.
Texaco, Inc.*, 842 F.2d 1034 (9th Cir. 1987)...................................................20, 21

*Gordon v. Lewistown Hosp.*,
    423 F.3d 184 (3d Cir. 2006).................................................................................16

*Hasbrouck v. Texaco, Inc.*,
    842 F.2d 1034 (9th Cir. 1987) .............................................................................20

*ILC Peripherals Leasing Corp. v. IBM*,
    458 F. Supp. 423 (N.D. Cal. 1978), *aff'd per curiam sub nom. Memorex Corp.*
    *v. IBM*, 636 F.2d 1188 (9th Cir. 1980) .............................................................20

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977).............................................................................................11

*In re Indep. Serv. Orgs. Antitrust Litig.*,
    114 F. Supp. 2d 1070 (D. Kan. 2000)..................................................................32

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) ..............................................................................8

*Kowal v. MCI Comm. Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ............................................................................29

*Ledwick v. AstraZeneca Pharms. LP*,
    No. BC 324518 (Ca. Super. Ct. Sept. 21, 2005) ................................................30

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
    238 F.3d 363 (5th Cir. 2001) ..............................................................................28

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).............................................................................................23

*Medtronic Minimed Inc. v. Smiths Medical MD Inc.*,
    371 F. Supp. 2d 578 (D. Del. 2005).....................................................................20

*Memorex Corp. v. IBM*,
    636 F.2d 1188 (9th Cir. 1980) .............................................................................20

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ............................................................................16

*Milum v. AstraZeneca Pharms. L.P.*,
    No. CV 2004-77 (Ark. Cir. Ct. May 24, 2006).....................................................30

*Morris Comm. Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004) ....................................................................16, 31

*Multivideo Labs, Inc. v. Intel Corp.*,
    No. 99-3908, 2000 WL 12122 (S.D.N.Y. 2000).........................................................32

*National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1988)..............................................................31, 32, 39

*New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.*,
    323 F. Supp. 2d 559 (S.D.N.Y. 2004).........................................................17

*Northeastern Telegraph Co. v. AT&T*,
    651 F.2d 76 (2d Cir. 1981).......................................................................19

*In re Omeprazole Patent Litig.*,
    84 Fed. Apdx. 76, 2003 WL 22928641 (Fed. Cir. 2003)................................4

*In re Omeprazole Patent Litig.*,
    72 U.S.P.Q. 2d 1540, 2004 U.S. Dist. LEXIS 15619 (S.D.N.Y. 2004)......................10

* *Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc.*,
    No. 05-075-SLR, 2005 WL 2993937 (D. Del. 2005), *appeal pending*,
    No. 05-5340 (3d Cir.).........................................................................4, 15, 30

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ...................................................................34

*Prohias v. AstraZeneca Pharms. LP*,
    No. 05-2433-CA-30 (Fla. Cir. Ct., Oct. 11, 2006, appeal pending) ..........................30

*Response of Carolina, Inc. v. Leasco Response, Inc.*,
    537 F.2d 1307 (5th Cir. 1976) ................................................................20

*In re Rezulin Prods. Liab. Litig.*,
    392 F. Supp. 2d 597 (S.D.N.Y. 2005)........................................................35

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).....................................................................28

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
    902 F.2d 222 (9th Cir. 1990) ...................................................................38

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
    Consumer Pharm. Co.*,
    Nos. 95-7011, 95-7688, 1996 WL 280810 (S.D.N.Y. 1996).......................38

*Tate v. Pacific Gas & Elec. Co.*,
    230 F. Supp. 2d 1072 (N. D. Cal. 2002) .............................................32, 35

*Town of Concord, Mass. v. Boston Edison Co.*,
915 F.2d 17 (1st Cir. 1990)................................................................16, 22, 27

*United Indus. Corp. v. Clorox Co.*,
140 F.3d 1175 (8th Cir. 1998) ................................................................34

*United States v. Citizens & Southern Nat. Bank*,
422 U.S. 86 (1975)................................................................21

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005)................................................................25

*United States v. Lane Laboratoriess-USA Inc.*,
427 F.3d 219 (3rd Cr. 2005) ................................................................6

*United States v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004)................................................................29

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ................................................16, 25, 26, 31

*United States v. Park*,
421 U.S. 658 (1975)................................................................6

*United States v. Rx Depot, Inc.*,
438 F.3d 1052 (10th Cir. 2006) ................................................................6

* *Verizon Comm. Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ................................................................16, 21

*In re Vertex Pharm., Inc. Sec. Litig.*,
357 F. Supp. 2d 343 (D. Mass. 2005) ................................................................8

*Vess v. Ciba-Geigy Corp.*,
317 F.3d 1097 (9th Cir. 2003) ................................................................28

*In re Warfarin Sodium Antitrust Litig.*,
No. 98-1232, 1998 WL 883469 (D. Del. 1998), *reversed on other grounds*,
214 F.3d 395 (3d Cir. 2000)................................................................32, 39

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
412 U.S. 609 (1973)................................................................23

*In re Wellbutrin SR/Zyban Antitrust Litig.*,
281 F. Supp. 2d 751 (E.D. Pa. 2003) ................................................................8

*Witherspoon v. Philip Morris Inc.*,
        964 F. Supp. 455 (D.C. Cir. 1997) ............................................................................31

## FEDERAL STATUTES, REGULATIONS AND RULES

21 C.F.R. § 10.25(a) ........................................................................................................40

21 C.F.R. § 10.30 ............................................................................................................40

21 C.F.R. § 202.1 ......................................................................................................6, 38

21 C.F.R. § 202.1 ..............................................................................................................6

21 C.F.R. § 202.1(e)(6)(i) ...........................................................................................6, 22

21 C.F.R. § 314.50(c)(2)(i) ...............................................................................................5

21 C.F.R. § 314.81(b)(3)(i) ....................................................................................6, 13, 22

21 C.F.R. § 314.105(c) .....................................................................................................5

21 C.F.R. § 314.125(b)(2)-(5) ..........................................................................................5

21 C.F.R. § 314.125(b)(6) .......................................................................................6, 22, 38

21 C.F.R. § 314.126 ..........................................................................................................5

15 U.S.C. § 2 ...................................................................................................................10

15 U.S.C. § 15b ..............................................................................................................29

21 U.S.C. § 332 *et seq* .....................................................................................................6

21 U.S.C. § 352(n) .....................................................................................................6, 38

21 U.S.C. § 355(a) .....................................................................................................5, 22

21 U.S.C. § 355(b) .....................................................................................................5, 22

21 U.S.C. § 355(b)(1)(F) ................................................................................................38

F.R.Civ.P. 9(b) .......................................................................1, 3, 17, 27, 28, 29, 30, 40

F.R.Civ.P. 12(b)(6) .............................................................1, 15, 16, 17, 28, 40

## OTHER AUTHORITIES

*Agency Information Collection Activities,*
      66 Fed. Reg. 42,664, 42,665 (Aug. 14, 2001)...............................................................6

FDA, *Professional Product Labeling,*
      60 Fed. Reg. 52,196 (Oct. 5, 1995).......................................................................6, 38

*Consumer-Directed Promotion of Regulated Medical Products,*
      70 Fed. Reg. 54,054, 54,056 (Sept. 13, 2005) ............................................................6

FDA, *Requirements on Content and Format of Labeling for Human Prescription Drug
      and Biological Products,*
      71 Fed. Reg. 3922, 3968 (Jan. 24, 2006) ..................................................................38

\* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 737b (1978) ...........................................27

\* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 738a (1978) ........................................3, 32

3A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 781e (2005) ....................................20

3A P.E. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 782a (Supp. 2005) .......................35

S. Breyer, *In Memoriam: Phillip E. Areeda,* 109 Harv. L. Rev. 889, 890 (1996).........32

R. Bork, *The Antitrust Paradox* 314 (2d ed. 1993)......................................................21

Herbert Hovenkamp, *The Monopolization Offense,*
      61 Ohio St. L.J. 1035, 1037 (2000).........................................................................18

## STATEMENT OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants AstraZeneca Pharmaceuticals L.P., AstraZeneca L.P., Zeneca, Inc. and Zeneca Holdings, Inc. (collectively, "AstraZeneca") have moved to dismiss the First Amended Complaints in five related cases under F.R.Civ.P. 12(b)(6) and 9(b). All of these cases were filed within days of each other, and more than five years after the principal events at issue. The substantive allegations in all five cases are identical, although two of them are individual actions while the other three are styled as class actions.[1] For the Court's convenience, and pursuant to agreement among the parties, AstraZeneca will cite to the First Amended Complaint of Walgreen Co. ("Wal. FAC") as representative of the non-class complaints, and to the First Amended Complaint of Louisiana Wholesale Drug Co. ("La. FAC") as representative of the putative class complaints. *See* Stipulation (Feb. 2, 2007) entered in each case.

## INTRODUCTION AND SUMMARY

Since 1989, AstraZeneca has sold the prescription drug Prilosec® (omeprazole) in the United States. Prilosec was approved by the Food and Drug Administration ("FDA") for, among other things, the healing of erosive esophagitis ("EE"), which is damage to the lining of the esophagus, and the treatment of symptomatic gastroesophageal reflux disease ("GERD" or acid reflux disease), which manifests itself in frequent heartburn. In 2001, the FDA approved Nexium® (esomeprazole magnesium) for these same indications, as well as others.

---

[1] The individual actions are *Walgreen Co., et al. v. AstraZeneca Pharmaceuticals L.P., et al.*, No. 1:06-cv-02084-RWR, and *Rite Aid Corporation, et al. v. AstraZeneca Pharmaceuticals L.P., et al.*, No. 1:06-cv-02089-RWR. The purported class actions are *Meijer, Inc., et al. v. AstraZeneca Pharmaceuticals L.P., et al.*, No. 1:06-cv-02155-RWR, *Louisiana Wholesale Drug. Co., Inc. v. AstraZeneca Pharmaceuticals L.P., et al.*, No. 1:06-cv-02157-RWR, and *Burlington Drug Company, Inc., et al. v. AstraZeneca Pharmaceuticals L.P., et al.*, No. 1:07-cv-00041-RWR.

Plaintiffs have advanced the novel and unprecedented antitrust theory that it was anti-competitive for AstraZeneca to introduce Nexium—thereby expanding the choices open to doctors and patients—because the availability of Nexium reduced the sales of "generic" versions of Prilosec. This theory should be rejected as a matter of law. Offering a new drug cannot be exclusionary or predatory under the antitrust laws, particularly when the drug has been approved by the FDA as safe and effective. Plaintiffs allege that Nexium did not represent a "significant clinical advance over omeprazole in the first-line treatment of patients with acid-related disorders." Wal. FAC ¶ 86; La. FAC ¶ 88. AstraZeneca disputes that allegation; but whether or not Nexium was a "significant clinical advance," it undoubtedly expanded the range of choices available to physicians and patients. The antitrust laws leave it to doctors and patients, not courts or juries, to choose the products they prefer. *See* page 19, *infra*.

Plaintiffs also complain that AstraZeneca increased consumers' choices by introducing another FDA-approved product, Prilosec OTC®. This is a non-prescription ("over-the-counter") tablet that is approved and marketed for the short-term treatment of heartburn. Plaintiffs allege that many managed care organizations ("MCOs") stopped covering prescriptions for Prilosec (both branded and generic) after the OTC tablets became available, although there is no allegation that any MCO did so because of an agreement with AstraZeneca. In essence, plaintiffs are complaining that AstraZeneca offered more attractive products than its generic competitors. Prilosec OTC was more attractive because, the plaintiffs state, it was cheaper and did not require a doctor's prescription. Nexium was more attractive to some patients whose health plans covered it, according to plaintiffs; in those circumstances, doctors were able to "confer a financial benefit on the patient by prescribing Nexium." Wal. FAC ¶ 102; La. FAC ¶ 104. It is simply not an antitrust violation to offer products that consumers find more appealing than the alternatives. *See* page 26, *infra.*

Plaintiffs' other main allegation is that AstraZeneca undertook a "deceptive campaign of distortions and misdirections regarding the superiority of Nexium." Wal. FAC ¶¶ 116, 122; La. FAC ¶¶ 118, 123. The complaints, however, fail to describe these alleged statements with the "particularity" that Rule 9(b) demands. Although plaintiffs refer to a "massive advertising and detailing campaign" (Wal. FAC ¶ 90; La. FAC ¶ 92), the complaints do not attach any advertisements or literature. They do not specify exactly *what* was said, or to *whom*, or *when*. Nor do they allege that AstraZeneca's claims were unsupported by, or inconsistent with, the FDA-approved labeling for Nexium.

Apart from this Rule 9(b) deficiency, the complaints do not satisfy the standards for treating allegedly deceptive conduct as monopolization. The antitrust laws are concerned with conduct that has enduring market-wide effects, not with creating a treble-damage remedy for false advertising. Accordingly, the courts have widely adopted the strict Areeda-Turner test for judging whether false advertising claims rise to the level of a Section 2 violation. *See* page 32, *infra*. Under that test, plaintiffs do not state a monopolization claim because (1) the allegedly deceptive statements were not "clearly false"; (2) for the most part, they were puffery and not "clearly likely to induce reasonable reliance"; (3) the remaining statements were made to physicians and MCOs that were "not without knowledge of the subject matter"; and (4) the statements were "susceptible of neutralization or other offset" by the FDA, doctors, critics and competitors. *See* 3 P. Areeda & D. Turner *Antitrust Law* ¶ 738a, at 278-79 (1978).

Finally, even if plaintiffs could satisfy the foregoing standards, their antitrust claims must still be rejected as an impermissible collateral attack on the FDA-approved labeling for Nexium. In another putative class action where essentially the same factual allegations were made under tort law and a state consumer fraud statute, and where the complaints *did* attach numerous actual ads, Chief Judge Robinson of the Delaware District Court dismissed the

3

complaint because she found that all of AstraZeneca's statements about Nexium were supported

by the FDA-approved labeling. *Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc.*, No.

05-075-SLR, 2005 WL 2993937, at *4 (D. Del. 2005), *appeal pending*, No. 05-5340 (3d Cir.).

An antitrust suit is simply not a legitimate forum for second guessing the FDA's labeling

decisions.

## STATEMENT OF FACTS

### I.      The Products

Both Prilosec and Nexium are in the therapeutic category of drugs known as

proton-pump inhibitors ("PPIs"), which reduce the production of stomach acid.  Wal. FAC ¶ 42;

La. FAC ¶ 44.  Other branded (non-generic) PPIs, made by other companies, are Prevacid®,

Protonix® and Aciphex®.  PPIs are used to treat GERD and EE.  Wal. FAC ¶ 73; La. FAC ¶ 75.

### A.      Prilosec

Prilosec was the world's first PPI.  AstraZeneca was awarded a number of patents

relating to Prilosec, which were found to be valid.  Wal. FAC ¶ 49; La. FAC ¶ 51, citing *Astra

Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423 (S.D.N.Y. 2002), *aff'd sub nom. In re

Omeprazole Patent Litigation*, 84 Fed. Apdx. 76, 2003 WL 22928641 (Fed. Cir. 2003).  As noted

in the district court decision, Prilosec was "the result of more than twenty years of research."

222 F. Supp. 2d at 434.  The work began in 1967, but it was only in 1979 that AstraZeneca's

"scientists first made the compound omeprazole."  *Id*.  "Even once the compound itself had been

developed, the task of turning the compound omeprazole into a viable medicine proved to be

formidable."  *Id*.  Another ten years of work ensued before Prilosec was first approved by the

FDA in 1989.  Wal. FAC ¶ 44; La. FAC ¶ 46.  AstraZeneca then had to persuade doctors and

consumers of the therapeutic benefits of Prilosec.  By 1999, ten years after it was introduced,

Prilosec was "the top-selling drug in the world."  Wal. FAC ¶ 42; La. FAC ¶ 44.

### B.    Nexium

In the meantime, AstraZeneca's scientists tested many other compounds for acid-

reducing effectiveness, including esomeprazole magnesium, which ultimately became known as

Nexium.  Plaintiffs concede that AstraZeneca spent "enormous" sums on research, development

and testing of Nexium.  Wal. FAC ¶¶ 66, 67, 76; La. FAC ¶¶ 68, 69, 78.

From a chemical standpoint, Nexium is classified as an "enantiomer" of Prilosec.

Wal. FAC ¶ 1; La. FAC ¶ 1.  Although plaintiffs refer to Nexium as "a slight chemical variant"

of Prilosec, they admit that the two drugs are "not chemically identical."  Wal. FAC ¶¶ 41, 46;

La. FAC ¶¶ 43, 48.  Indeed, as shown below, the FDA-approved labeling sets forth clinical

differences between Nexium and Prilosec.

Like all prescription drugs, Nexium is subject to extensive regulation by the FDA,

which has exclusive jurisdiction to determine whether to approve each new drug application

("NDA") to market a drug in the United States.  21 U.S.C. §§ 355(a), (b).  An NDA must include

the clinical studies and reports demonstrating that the drug is "safe" and "effective" for its

proposed uses, as well as the proposed labeling, which provides crucial information on the drug's

pharmacology, uses and indications, recommended dosage, adverse events and contraindications.

*See* 21 U.S.C. § 355(b); 21 C.F.R. §§ 314.50(c)(2)(i), 314.125(b)(2)-(5), 314.126.  The FDA will

approve an NDA only "after it determines that the drug meets the statutory standards for safety

and effectiveness, manufacturing and controls, and labeling."  21 C.F.R. § 314.105(c).

The labeling "communicates the conclusions of FDA review of the data" in the

NDA and provides the basis for how a manufacturer can promote its drug in compliance with the

FDA's extensive regulations for prescription drug advertising.  FDA, *Professional Product Labeling*, 60 Fed. Reg. 52,196 (Oct. 5, 1995); *see also* 21 C.F.R. § 202.1.  The FDA may not approve a drug unless it first concludes that the labeling is not "false or misleading."  21 C.F.R. § 314.125(b)(6).

The FDA also regulates the promotion and advertising of prescription drugs.  21 U.S.C. § 352(n) (empowering the FDA to regulate prescription drug advertising).  Manufacturers must submit promotional labeling and advertising for their drugs to the FDA at the time those materials are first used.  21 C.F.R. §134.81(b)(3)(i).  Indeed, the FDA permits, and in some cases requires, manufactures to submit their ads for advance approval.  21 C.F.R. §202.1(j).  The FDA also regulates comparative advertising.  Any claim that one drug is safer or more effective than another must be based on the labeling or supported by "substantial evidence" or "substantial clinical experience."  *See* 21 C.F.R. §202.1(e)(6)(i).

The FDA has numerous options for addressing advertising that does not meet its requirements, and it actively exercises its enforcement authority over the promotion of drugs. *See* 21 U.S.C. § 332 *et seq.* (seizure, injunction, criminal fines, imprisonment); *cf. United States v. Park*, 421 U.S. 658 (1975) (strict criminal liability of CEO for violations of the FDCA); *United States v. Rx Depot, Inc.*, 438 F.3d 1052, 1061 (10th Cir. 2006) (disgorgement for FDCA violations); *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 223, 229 (3rd Cir. 2005) (restitution for violations of the FDCA).

The FDA's regulations are designed "to ensure that the promotion of medical products directed to professionals and consumers is truthful, not misleading, and contains balanced risk and benefit information."  *Consumer-Directed Promotion of Regulated Medical Products*, 70 Fed. Reg. 54,054, 54,056 (Sept. 13, 2005); *see also Agency Information Collection Activities*, 66 Fed. Reg. 42,664, 42,665 (Aug. 14, 2001) (explaining that the FDA is "responsible

for assuring that the labeling and advertising of prescription drugs is truthful and not

misleading").

In support of its NDA for Nexium, AstraZeneca submitted the results of fourteen

clinical studies to the FDA.  Wal. FAC ¶ 74; La. FAC ¶ 76.  For the treatment of erosive

esophagitis, Nexium was tested at different doses – 40 mg and 20 mg – and compared with

Prilosec at its FDA-approved dose of 20 mg for this indication.  Wal. FAC ¶¶ 80,  81, 83, 85; La.

FAC ¶¶ 82,  83, 85, 87.  Even plaintiffs admit that one study "showed a moderate difference in

healing rates of EE in favor of 40 mg Nexium over 20 mg Prilosec."  Wal. FAC ¶ 83; La. FAC

¶ 85.  Plaintiffs also admit that, for the treatment of heartburn caused by acid reflux disease

(GERD), one study "showed a slight statistically significant difference in favor of 40 mg Nexium

in heartburn resolution percentage at the four-week mark."  Wal. FAC ¶ 80; La. FAC ¶ 82.

In February 2001, AstraZeneca received FDA approval to market Nexium for

healing EE, maintaining the healing of EE and treating symptomatic GERD (as well as other

indications).  The FDA also approved the labeling for Nexium.  Plaintiffs admit that there were

"negotiations between the FDA and AstraZeneca" about whether the results of particular clinical

studies should be summarized in the label.  Wal. FAC ¶ 89; La. FAC ¶ 91.  Following its

deliberations, "the FDA approved the Nexium product label and the inclusion of the trial results

in the label."  Wal. FAC ¶ 89; La. FAC ¶ 91.

Attached hereto as Exhibit A is the FDA-approved label for Nexium.[2]  Among other things, it reports that "[t]he healing rates of NEXIUM 40 mg . . . and omeprazole 20 mg (the approved dose for this indication) were evaluated in patients with endoscopically diagnosed erosive esophagitis."  Ex. A at 13.  The labeling includes a chart that summarizes the data on EE healing rates.  It shows that in all the studies, Nexium 40 mg had a greater healing rate than omeprazole, and in two of those studies, the difference was statistically significant.  The label also summarizes the data on heartburn resolution, and it shows that in those two studies, Nexium had a statistically significant better "sustained heartburn resolution and time to sustained heartburn resolution."  *Id.* at 14.

### C.     Prilosec OTC

In January 2000, AstraZeneca and its "marketing partner, Procter & Gamble," applied to the FDA for approval to sell a non-prescription, over-the-counter Prilosec OTC tablet for short-term use (up to 14 days).  Wal. FAC ¶ 98; La. FAC ¶ 100.  AstraZeneca performed and submitted studies showing the safety of such short-term use of Prilosec without physician oversight.  Wal. FAC ¶ 99; La. FAC ¶ 101.  Three and a half years later, the FDA approved the application, and Prilosec OTC was introduced in September 2003.  Wal. FAC ¶¶ 99-100; La. FAC ¶¶ 101-102.

---

[2] The Nexium label is expressly referred to and quoted in the complaints (Wal. FAC ¶ 89; La. FAC ¶ 91), and therefore, the Court may consider it in ruling on a motion to dismiss.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  It may also be considered under the general rule that "public records [are] subject to judicial notice on a motion to dismiss."  *Id.*; *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997).  The FDA-approved label for Nexium is found on the FDA's web site.  *See* http://www.fda.gov/cder/ foi/nda/2001/21154_Nexium_prntlbl.pdf.  The courts routinely take judicial notice of documents found on the FDA web site.  *See*, *e.g.*, *In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 755 n.2 (E.D. Pa. 2003); *In re Vertex Pharm., Inc. Sec. Litig.*, 357 F. Supp. 2d 343, 352 n.4 (D. Mass. 2005).

### D.    Generic Omeprazole

The complaints allege that a "generic" version of a branded drug is one that has the same active ingredient and has been found by the FDA to be "therapeutically equivalent" and "bioequivalent."  Wal. FAC ¶ 39; La. FAC ¶ 41.  All 50 states have drug product selection laws "that permit or require the pharmacist to dispense a generic drug in lieu of a brand drug whenever possible."  Wal. FAC ¶ 24; La. FAC ¶ 26.

The complaints assert that "[t]he first generic competitor to enter a market . . . . quickly takes a substantial amount of market share away from the brand-name manufacturer . . . . In many cases, generic competitors . . . have captured as much as 90% of the brand-name drug's pre-generic sales."  Wal. FAC ¶ 28; La. FAC ¶ 30.  The generic firms achieve these results without promoting their products to doctors.  Indeed, the complaints allege that it is "economically infeasible" for them to promote their products in this fashion.  Wal. FAC ¶ 22; La. FAC ¶ 24.

Generic firms must, of course, honor the patents on branded drugs.  Plaintiffs assert that "an unscrupulous brand manufacturer" can keep a generic drug off the market by bringing a patent suit "without regard to the merit of the patentee's claim."  Wal. FAC ¶¶ 38-39; La. FAC ¶¶ 40-41.  This innuendo is totally unwarranted here, for plaintiffs do not claim that there was anything sham about AstraZeneca's Prilosec patent litigation.  On the contrary, plaintiffs concede that the court upheld the validity of the "relevant patents" and found that three of the proposed generic versions of Prilosec infringed the Prilosec patents.  Wal. FAC ¶ 49; La. FAC ¶ 51.  In fact, the presiding judge called the Prilosec patent litigation "an overwhelming victory for Astra" because the validity of AstraZeneca's patents were confirmed, the defendants were found to have "infringed two of Astra's patents," and AstraZeneca "obtained a judgment

whereby Defendants are enjoined from marketing their generic omeprazole products through 2007." *In re Omeprazole Patent Litig.*, 72 U.S.P.Q.2d 1540, 2004 U.S. Dist. LEXIS 15619, at *4, *1 (S.D.N.Y. 2004).

The court did find, however, that one company had a generic version of omeprazole that did not infringe, and in December 2002, that company began selling it.  Wal. FAC ¶ 49; La. FAC ¶ 51.  Thus, since December 2002, a pharmacy could fill a prescription for omeprazole with generic.  Moreover, since December 2002, if a doctor has written a prescription for Prilosec, the pharmacist has been permitted or required to substitute generic omeprazole, unless the doctor has expressly forbidden substitution.  Wal. FAC ¶ 24; La. FAC ¶ 26.

## II.      The Allegations in the Complaints

Plaintiffs have brought two-count complaints under Section 2 of the Sherman Act, 15 U.S.C. § 2.  One count alleges monopolization and the other, an attempt to monopolize.  Wal. FAC at pp. 41-42; La. FAC at pp. 40-41.  The allegations are summed up in Wal. FAC ¶ 122 and La. FAC ¶ 123:

> During the relevant period, AstraZeneca willfully engaged in exclusionary, anticompetitive conduct designed to impair competition on the merits, including, *inter alia*:  (a) introducing Nexium, a drug virtually identical to and no more effective than Prilosec, solely to prevent generic competitors from competing . . . ; (b) intentionally not conducting and/or reporting clinical studies comparing the use of 40 mg Prilosec to the use of 40 mg Nexium in the treatment of EE, . . . [and] (c) engaging in a massive advertising and promotional campaign of distortions and misdirections to switch patients from Prilosec to Nexium.

### A.      The Plaintiffs

The plaintiffs in these cases fall into two categories.  Two cases were brought by corporations that operate thousands of retail pharmacies under such well-known names as Walgreen's, Rite Aid, Eckerd, Kroger and Safeway.  Most of these chain pharmacy plaintiffs do

not buy Prilose or Nexium from AstraZeneca, but only from wholesalers. Wal. FAC ¶¶ 2, 4-9. Because they are "indirect" purchasers, they lack standing to sue on their own behalf for damages under the Sherman Act. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) (only "direct purchasers" may sue for damages under the antitrust laws). However, they claim to sue as "assignee[s]" of their wholesalers, such as McKesson Corporation or Cardinal Health, which allegedly bought directly from AstraZeneca.[3] Wal. FAC ¶¶2, 4-9.

The other plaintiffs, such as Louisiana Wholesale Drug Company, are mostly wholesale distributors of pharmaceutical products, and they seek to represent a class consisting of "all persons or entities that purchased prescription omeprazole (and/or any of its enantiomers)"—*i.e.*, Prilosec, Prilosec OTC, generic omeprazole, or Nexium—"directly from AstraZeneca."[4] La. FAC ¶ 11.

Plaintiffs allege that they were injured by Nexium's success. This is an odd claim given the huge number of Nexium prescriptions filled by the pharmacy plaintiffs' pharmacists or shipped by the wholesaler plaintiffs' distribution networks. Plaintiffs say they could have benefited "by substituting lower-priced generic omeprazole for their purchases of higher-priced Nexium." Wal. FAC ¶ 111; La. FAC ¶ 113. In other words, their complaint is that they would have been able to buy (and resell) cheaper drugs if only the FDA had not approved Nexium or doctors had chosen to prescribe Prilosec instead of Nexium.

---

[3] AstraZeneca accepts these allegations of assignment as true for purposes of these motions only. However, to the extent any plaintiff that had no direct purchases seeks damages "in its own behalf," *see* Wal. FAC ¶¶2-9, those claims must be dismissed. Such a plaintiff may pursue claims for damages only to the extent that its alleged assignor could seek damages and then, only to an extent consistent with the scope of an assignment.

[4] One putative class representative, Meijer, Inc., does not belong to the class it seeks to represent. Meijer does not allege that it bought Priolosec or Nexium directly from AstraZeneca, but rather sues as an assignee of its distributor. Meijer FAC ¶2.

### B.    The Alleged Relevant Market

The complaints accuse AstraZeneca of monopolizing "the market for omeprazole and its enantiomers, including the prescription drugs Prilosec, Nexium and any AB-rated generic equivalents." Wal. FAC ¶ 1; La. FAC ¶ 1. This market definition excludes the other proton-pump inhibitors (Prevacid, Protonix and Aciphex), even though all PPIs have been approved by the FDA for treatment of the same "relevant conditions." Wal. FAC ¶¶ 65, 73; La. FAC ¶¶ 67, 75. Indeed, plaintiffs allege that AstraZeneca marketed Nexium against the "other PPIs," and that Nexium and Prilosec lost sales to other PPIs. Wal. FAC ¶¶ 91, 65; La. FAC ¶¶ 93, 67.

If the relevant market were defined as PPIs, then on the facts alleged here, AstraZeneca's share would be at most 45 percent. *See* Wal. Cmplt. ¶ 67; Wal. FAC ¶ 65; La. Cmplt. ¶ 70; La. FAC ¶ 67 ("AstraZeneca had U.S. sales of 33 million units of Nexium and Prilosec combined," compared to 73.9 million units for "all proton-pump inhibitors" in 2002).

### C.    The Introduction of Nexium and Prilosec OTC

Plaintiffs contend that "introducing Nexium" was an "exclusionary" act. Wal. FAC ¶ 122; La. FAC ¶ 123. The complaints allege that if Nexium had never been available to doctors and patients, then "generic Prilosec would have captured at least 85%" of the relevant market; instead, the generic Prilosec share is less than 30%. Wal. FAC ¶¶ 106, 108; La. FAC ¶¶ 108, 110. This outcome is "anticompetitive," plaintiffs assert, because Nexium is allegedly "no more effective than Prilosec." Wal. FAC ¶ 122; La. FAC ¶ 123.

In addition, plaintiffs contend that the introduction of non-prescription Prilosec OTC was anti-competitive because it "cause[d] insurers not to reimburse patients for the cost of generic Prilosec." Wal. FAC ¶ 96; La. FAC ¶ 98. The complaints do not allege that insurers stopped covering "generic Prilosec," *i.e.*, omeprazole, because of any kind of agreement or

understanding with AstraZeneca.  Rather, plaintiffs allege that "it is the policy of MCOs covering the vast majority of consumers to discontinue providing coverage for prescription pharmaceuticals when an over-the-counter ('OTC') version of a prescription product becomes available."  Wal. FAC ¶ 97; La. FAC ¶ 99.  They allege that because MCOs *do* provide coverage for Nexium, "the physician can confer a financial benefit on the patient by prescribing Nexium rather than . . . writing a prescription for Prilosec."  Wal. FAC ¶ 102; La. FAC ¶ 104.  Thus, although *patients* could save money with Nexium, the complaint here is that *plaintiffs* were worse off because they paid a higher price for Nexium than for generic omeprazole.  Wal. FAC ¶ 111; La. FAC ¶ 113.

### D.    The Allegedly Deceptive Advertising

Plaintiffs allege that AstraZeneca engaged in a "deceptive campaign of distortions and misdirections regarding the superiority of Nexium."  Wal.  FAC ¶ 116; La. FAC ¶ 118. Plaintiffs do not allege that they themselves were defrauded.  They do not allege that the claims made by AstraZeneca were inconsistent with, or unsupported by, the labeling for the drugs approved by the FDA.  They do not allege that the FDA ever objected to any of the promotional materials for Nexium, even though AstraZeneca was required to submit specimens of mailings and advertisements to the FDA "at the time of initial publication."[5]  Furthermore, the complaints do not state *when* the allegedly misleading statements were made, or to *whom*, or *where*.

---

[5] An FDA regulation states that every drug manufacturer must "submit specimens of mailing pieces and any other labeling or advertising devised for promotion of the drug product at the time of initial dissemination of the labeling and at the time of initial publication of the advertisement for a prescription drug product."  21 C.F.R. § 314.81(b)(3)(i).

Without providing details, plaintiffs offer snippets allegedly found in "printed advertisements directed to doctors and patients."  Wal. FAC ¶ 92; La. FAC ¶ 94.  Plaintiffs depict the advertisements as follows (all brackets and ellipses are plaintiffs'):

> AstraZeneca claimed, for example, that "we've captured the essence of Prilosec and created a new PPI . . . introducing Nexium the powerful new PPI from the makers of Prilosec."  The ads asserted that, "In erosive esophagitis studies compared with Prilosec" Nexium had "[p]roven efficacy in short-term healing (4-8 weeks)" and "[p]roven symptom control," and was an "effective first-line PPI therapy."  Yet another ad asserted that "In erosive esophagitis studies compared with Prilosec (omeprazole)," Nexium will "Stop the heartburn – Start the HEALING."

Wal. FAC ¶ 92; La. FAC ¶ 94.

Plaintiffs do not allege that any of these statements was untrue.  They do not deny that Nexium was an "effective first-line PPI therapy" with "[p]roven efficacy in short-term healing" of EE and "[p]roven symptom control."  Rather, their objection is to what, in their view, the advertisements "falsely suggest[ed]."  Wal. FAC ¶ 92; La. FAC ¶ 94.  Because the ads mentioned "erosive esophagitis studies" in which Nexium was "compared with Prilosec," plaintiffs assert that readers would interpret the ads as saying that "Nexium is *better than* Prilosec in stopping heartburn" and "has *more* efficacy in healing, *more* symptom control, and *more* effectiveness as a first-line therapy."  Wal. FAC ¶ 92; La. FAC ¶ 94 (plaintiffs' emphasis).

Plaintiffs further allege that it was deceptive for AstraZeneca to claim that Nexium was more effective than Prilosec in healing EE.  According to plaintiffs, this claim was misleading because it "was based solely upon a comparison of 40 mg of Nexium to 20 mg of Prilosec"; because "AstraZeneca had no study showing clinical superiority of 20 mg of Nexium over 20 mg of Prilosec"; and because AstraZeneca never conducted any "clinical studies comparing the use of 40 mg Prilosec to the use of 40 mg Nexium in the treatment of EE."  Wal. FAC ¶¶ 93b-e, 122; La. FAC ¶¶ 95b-e, 123.  Plaintiffs do not allege that the FDA ever *requested*

any study of Prilosec at the 40 mg level, and admit that "Prilosec had not been FDA-approved at 40 mg for EE."  Wal. FAC ¶ 84; La. FAC ¶ 86.

The same fraud allegations were advanced in the *Pennsylvania Employee Benefit Trust Fund* case discussed earlier (hereinafter, "*PEBTF*"), where Chief Judge Robinson granted AstraZeneca's motion to dismiss under Rule 12(b)(6).  The court found that all of the claims made by AstraZeneca in its advertising were "consistent with the FDA-approved labeling."  *PEBTF*, 2005 WL 2993937 at *4.  Moreover, "in its review of the advertising materials of record, the court did not find any explicit statements that Nexium was 'superior' to Prilosec."  *Id.*

Plaintiffs also object to statements that were allegedly made by AstraZeneca's "sales force" when they visited "doctors who work for managed care organizations."  Wal. FAC ¶ 91; La. FAC ¶ 93.  During those visits, the detailers provided "literature, samples and promotional material" and allegedly told the MCO doctors "that Nexium has 'significantly greater healing and symptom resolution rates for EE patients;' that Nexium has a 'clinical advantage' over Prilosec; . . . [and] that Nexium is 'a better PPI.'"  Wal.  FAC ¶¶ 59, 91; La. FAC ¶¶ 61, 93.

Plaintiffs recognize that doctors received information about Nexium from sources other than AstraZeneca.  The complaints describe statements made by the Administrator of the Federal Centers for Medicare and Medicaid Services.  At the 2003 convention of the American Medical Association, he told the assembled doctors that "'You should be embarrassed if you prescribe Nexium' because it provides no increased medical benefits. . . .  'The fact is, Nexium is

Prilosec. . . .  It is the same drug.'"  Wal. FAC ¶ 94; La. FAC ¶ 96.  Presumably, plaintiffs know

about this statement because it was widely reported in the press.[6]

## ARGUMENT

In order to state a claim under Section 2 of the Sherman Act, a plaintiff must

allege "*predatory* or *exclusionary* acts or practices that have the effect of preventing or excluding

competition within the relevant market."  *Morris Comm. Corp. v. PGA Tour, Inc.*, 364 F.3d

1288, 1294 (11th Cir. 2004) (emphasis added).  *Accord United States v. Microsoft Corp.*, 253

F.3d 34, 58 (D.C. Cir. 2001) ("A firm violates § 2 only when it acquires or maintains, or attempts

to acquire or maintain, a monopoly by engaging in exclusionary conduct."); *Town of Concord,*

*Mass. v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990) (Section 2 applies only to

"exclusionary conduct"); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 215 (3d Cir. 2006)

(rejecting Section 2 claim because there were no "'predatory' or 'exclusionary' practices"); *Bell*

*Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (Section 2 claim requires

"predatory or exclusionary conduct"); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124,

1130 (9th Cir. 2004) (Section 2 claim requires "exclusionary conduct").

Moreover, as the Supreme Court's recent *Trinko* decision demonstrates, the courts

will scrutinize complaints asserting Section 2 violations, and will order dismissals of those

complaints where the alleged conduct as a matter of law cannot properly be deemed

exclusionary.  *Verizon Comm. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)

(upholding 12(b)(6) dismissal); *see also Covad Comm. Co. v. Bell Atlantic Corp.*, 398 F.3d 666

---

[6] *See*, *e.g.*, Robert Pear, "U.S. Limiting Costs of Drugs for Medicare," N.Y. Times (April 21, 2003); Gardiner Harris, "The Nation:  Prescription Drugs Filled; If Americans Want to Pay Less for Drugs, They Will," N.Y. Times (Nov. 16, 2003).

(D.C. Cir. 2005) (upholding 12(b)(6) dismissal of all but one claim); *New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004) (dismissing claims because the alleged conduct did not violate Section 2).

The conduct alleged here is not exclusionary as a matter of law. Plaintiffs attack the introduction of two new products, Nexium and Prilosec OTC, both of which were approved by the FDA for marketing in the United States. These products added to the choices available to consumers and doctors, and their introduction was therefore fully consistent with Section 2. Plaintiffs' allegations of false advertising do not salvage their Section 2 claims. These allegations are not pleaded with the particularity required by Rule 9(b); they fail multiple prongs of the Areeda-Turner test; and ultimately, they represent an impermissible collateral attack on the FDA's approval of Nexium.

## I.    As a Matter of Law, the Introduction of Nexium Was Not Exclusionary.

Plaintiffs here challenge conduct that represents the epitome of competition: giving consumers new choices by introducing new products. It is beyond dispute that Nexium *expanded* the range of choices available to physicians treating patients with acid reflux disease or erosive esophagitis. Before Nexium was introduced, a physician treating a patient with GERD or EE had four PPIs from which to choose: Prevacid, Protonix, Aciphex and Prilosec. Nexium provided another option.

Plaintiffs agree that Nexium and Prilosec are "not chemically identical." Wal. FAC ¶¶ 43,48. Nor to they dispute the FDA's finding that Nexium is "safe" and "effective" for treating GERD and EE. Indeed, the wholesaler plaintiffs have distributed, and the pharmacy plaintiffs have filled, millions of prescriptions for Nexium—prescriptions that were written by doctors who decided that Nexium was the right drug for their patients. Plaintiffs do not contend

that patients *never* benefited from taking Nexium rather than Prilosec.  They merely allege that

Nexium did not represent a "*significant* clinical advance over omeprazole in the *first-line*

treatment of patients with acid-related disorders."  Wal. FAC ¶  86; La. FAC ¶  88 (emphasis

added).  Of course, a drug need not represent a "significant clinical advance" to be beneficial in

appropriate cases – not only as a "first-line treatment," but also as a second-line alternative.  If

patients were not helped sufficiently by one of the older PPIs, the prescribing physician could

now choose Nexium as a second-line therapy.

   Plaintiffs cannot state an antitrust claim merely by alleging that the introduction

of Nexium hurt AstraZeneca's generic rivals.  "It is axiomatic that the antitrust laws were passed

for 'the protection of *competition*, not *competitors*.'"  *Brooke Group Ltd. v. Brown & Williamson

Tobacco Corp.,*  509 U.S. 209, 224 (1993) (emphasis in original), *quoting Brown Shoe Co. v.

United States,* 370 U.S. 294, 320 (1962).  As a leading antitrust scholar has written, "innovation

may injure rivals so severely that they are forced to exit from the market, but we would hardly

want an antitrust policy that condemns innovation itself as unlawful exclusion."  Herbert

Hovenkamp, *The Monopolization Offense*, 61 Ohio. St. L. J. 1035, 1037 (2000).  Here, the

makers of generic omeprazole were hardly excluded from the market.  On the contrary, they

eagerly rushed in, even though Nexium had already been promoted "aggressively" for nearly two

years, and (according to plaintiffs) they have captured nearly 30 percent of the alleged relevant

market.  Wal. FAC ¶¶ 60, 108; La. FAC ¶¶ 62, 110.

   At bottom, plaintiffs contend that they have an antitrust cause of action if they can

persuade a jury that Nexium was no better than Prilosec.  As shown below, this theory has

consistently been rejected even in *unregulated* markets.  It certainly should be rejected in this

case, where the expert federal agency that has the responsibility for determining which

pharmaceutical products may be sold in the United States has authorized its sale after finding it

to be safe, effective, and different than Prilosec.  The imposition of treble damage antitrust

liability in these circumstances could discourage the introduction of safe and effective drugs that

represent incremental improvement over existing therapies.

>    A.    **Plaintiffs Cannot State an Antitrust Claim by Alleging That Defendants'**
>          **New Product Was No Better Than Its Existing Product.**

The antitrust laws leave it to doctors and patients, not juries, to decide which

prescription drugs are best.  The courts have repeatedly rejected the argument advanced here –

that it was anti-competitive for a firm with alleged monopoly power to introduce a new product

that was allegedly no better than its existing products.  For example, in *Berkey Photo, Inc. v.*

*Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), Kodak promoted its new Pocket Instamatic

camera by introducing Kodacolor II film, which was not available for any other camera.  The

jury found that the new film was introduced with "monopolistic intent" and was not a genuine

product improvement.  The Second Circuit, however, held that these facts did not establish a

Section 2 violation.  "If a monopolist's products gain acceptance in the market, therefore, it is of

no importance that a judge or jury may later regard them as inferior, so long as that success was

not based on any form of coercion."  *Id*. at 287.  The court held that "any firm, even a

monopolist, may generally bring its products to market whenever and however it chooses."  *Id*. at

286.

Other courts have likewise refused to entertain challenges to product introductions

by alleged monopolists.  They recognize that the entry of a new product is generally pro-

competitive, and that its legality should not turn on a jury's after-the-fact technical evaluation of

the product's merit.  *E.g.*, *Northeastern Tel. Co. v. AT&T*, 651 F.2d 76, 93 (2d Cir. 1981)

("introducing new products" was not exclusionary); *California Computer Products, Inc. v. IBM*

*Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (given that IBM's new product was "attractive to

buyers," any dispute about whether that product really improved performance was not for the jury); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976) ("Any other conclusion would enmesh the courts in a technical inquiry into the justifiability of product innovations."); *ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423, 439-41 (N.D. Cal. 1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM*, 636 F.2d 1188 (9th Cir. 1980) (same); *Medtronic Minimed Inc. v. Smiths Medical MD Inc.*, 371 F. Supp. 2d 578, 589 (D. Del. 2005) ("[I]t is not the role of the courts to determine how companies should innovate. . . . Smiths' remedy for the competitive disadvantage it faces is in the marketplace, not in court.").

In sum, as the leading antitrust treatise concludes, "all product innovation should be lawful, setting aside only the possible case where investment in innovation is used to facilitate predatory pricing."  3A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 781e (2005).  Increasing consumers' choices through the introduction of a new product cannot itself constitute a violation of the Sherman Act.  "In order to state a claim for relief under section 2, product introduction must be alleged to involve some associated conduct which constitutes an anticompetitive abuse . . . , rather than aggressive competition on the merits."  *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545-46 (9th Cir. 1983), *overruled on other grounds by Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1041 (9th Cir. 1987).

This case falls squarely within the general rule that product innovation is not anti-competitive.  Plaintiffs' complaints contain no allegations of coercion, predatory pricing or other anti-competitive abuse.  Rather, plaintiffs complain solely about the fact that another product – generic omeprazole – became less attractive to consumers and doctors as a result of AstraZeneca's new products.  That may be true, but there is nothing anti-competitive about introducing new products and permitting customers to choose which ones they prefer.

Plaintiffs' case is not strengthened by their allegation that "AstraZeneca launched a massive advertising and detailing campaign" to promote Nexium. Wal. FAC ¶ 90; La. FAC ¶ 92. As the D.C. Circuit recently observed, "'advertising and promotion [are] essential to vigorous market rivalry.'" *Covad Comm. Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 674 (D.C. Cir. 2005), *quoting* R. Bork, *The Antitrust Paradox* 314 (2d ed. 1993). It is "perfectly consistent with the competitive forces that the Sherman Act was intended to foster" for a "dominant firm" to "increase consumer brand identification, or create demand for new products." *Foremost Pro Color*, 703 F.2d at 546. Moreover, as explained in Part III, *infra*, plaintiffs' vague allegations of deceptive advertising do not remotely satisfy the requirements of pleading a viable Section 2 claim that is premised on false advertising.

### B. Under *Trinko*, This Court Should Not Create an Unprecedented Exception That Would Allow Antitrust Challenges to the Introduction of FDA-Approved Drugs.

The Supreme Court's recent decision in *Verizon Comm. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004), strongly reinforces the conclusion that this Court should not allow plaintiffs to premise an antitrust claim on their allegation that an FDA-approved drug was not much better than an existing drug. If such a claim were recognized, it would be a new exception to the general rule that the introduction of a product is not an exclusionary act. In *Trinko*, the Supreme Court was asked to create a new exception to the general rule that any company, even a monopolist, may refuse to deal with a competitor. The Court was unwilling to do so, and made several points that apply here as well.

*Trinko* taught that when evaluating a monopolization claim, "'careful account must be taken of the pervasive federal and state regulation characteristic of the industry.'" 540 U.S. at 411, *quoting United States v. Citizens & Southern Nat. Bank*, 422 U.S. 86, 91 (1975).

"An antitrust rule that seeks to promote competition but nonetheless interferes with regulatory controls could undercut the very objectives the antitrust laws are designed to serve." *Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, C.J.).

The present case, like *Trinko*, arises in a heavily regulated industry, and the specific conduct that plaintiffs complain of – the introduction and advertising of a new drug – is subject to comprehensive regulatory oversight. Under federal law, the FDA decides whether new drugs can be sold, and before granting approval it must determine that the drug is "safe" and "effective." 21 U.S.C. §§ 355(a), (b). It must approve the labeling for drugs, and cannot grant approval if the labeling is "false or misleading." 21 C.F.R. § 314.125(b)(6). The FDA's extensive regulatory oversight of new drug approval and promotion reflects Congress's decision to grant the FDA exclusive authority whether to approve a "new drug application" to market a drug in the United States. 21 U.S.C. § 355(a), (b). And, as explained above, the FDA regulates the promotion and advertising of prescription drugs. Manufacturers, for example, must submit promotional labeling and advertising for their drugs to the FDA at the time those materials are first used, 21 C.F.R. §134.81(b)(3)(i); the FDA has specific requirements for comparative advertising, 21 C.F.R. §202.1(e)(6)(i); and the FDA has numerous enforcement options to address promotion or advertising that does not meet its requirements. *Supra* at 6.

This detailed statutory and regulatory framework extends, moreover, to the regulation of generic competition. As the complaints themselves set forth, Congress specifically addressed and balanced the competing concerns of creating and preserving incentives for new drug innovation, as well as fostering generic drug competition, when it enacted the Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), which expressly provides remedies for generic competitors who seek to challenge patented prescription drugs. *See* Wal. FAC ¶¶ 32-40; La. FAC ¶¶ 34-42. Creating a novel and unprecedented treble-damage

action for those generic competitors' customers—including plaintiffs and their assignors—is not among them.

Second, *Trinko* warned against bringing conduct within the ambit of Section 2 that is "'beyond the practical ability of a judicial tribunal to control.'"  540 U.S. at 414, *quoting Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993).  Judges and juries are ill-equipped to decide whether new pharmaceutical products should be introduced into the marketplace.  That is a question best left to the FDA, the "expert agency" to which Congress gave exclusive authority over new drug approvals.  *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973).

Third, and most importantly, *Trinko* emphasized that courts must be sensitive to "[t]he cost of false positives" when deciding whether the conduct at issue can be deemed exclusionary.  540 U.S. at 414.  "Mistaken inferences and the resulting false condemnations 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'"  *Id.*, *quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).  That concern carries special force when the conduct under challenge is the introduction of new pharmaceutical products that the FDA has found to be safe and effective.  If the introduction of these new drugs can expose pharmaceutical manufacturers to enormous treble damage suits, they may choose to avoid the risk by not selling their products – thereby depriving patients and physicians of therapeutic alternatives.

Opening the antitrust doors to claims of this sort could stifle the development and introduction of drugs which represent incremental but important improvements to existing treatments.  As plaintiffs acknowledge, manufacturers of branded drugs often test "closely related" chemicals in the hope of finding even better medicines.  *See* Wal. FAC ¶ 57; La. FAC ¶ 59.  This work is enormously expensive.  Plaintiffs allege that a *single* clinical trial can cost

23

"tens of millions of dollars."  Wal. FAC ¶ 76; La. FAC ¶ 78.  Even when the research provides a sound scientific basis for regarding a new drug as an improvement, it is easy for creative lawyers to allege that the drug was not a "significant clinical advance."

It is simply not the province of antitrust juries to decide whether new prescription drugs represent significant enough improvements to permit a company to market them.  Rather, the FDA decides which drugs may be introduced, and the marketplace decides which drugs succeed.  This Court should therefore decline plaintiffs' invitation to create a new exception to the rule that product introductions cannot be deemed exclusionary under Section 2 of the Sherman Act.

## II.     As a Matter of Law, the Introduction of Prilosec OTC Was Not Exclusionary.

The introduction of non-prescription Prilosec OTC was unequivocally pro-competitive.  Consumers were offered yet another new choice.  For the first time, they could purchase Prilosec without a prescription.  Consumers also benefited because AstraZeneca conducted studies demonstrating – to the satisfaction of the FDA, after a three-year approval process – that the short-term use of Prilosec was safe without physician oversight.  Wal. FAC ¶ 99; La. FAC ¶ 101.  Federal law places such a high value on encouraging companies to seek approval for over-the-counter pharmaceutical products – and on conducting the studies necessary to demonstrate their safety – that AstraZeneca was granted a three-year exclusivity period in which it was the only company authorized to sell omeprazole without a prescription.  Wal. FAC ¶ 99; La. FAC ¶ 101.

Plaintiffs contend that the introduction of Prilosec OTC was anti-competitive because it reduced the sales of *prescription* generic omeprazole.  Wal. FAC ¶ 104; La. FAC ¶ 106.  This outcome was hardly surprising.  To buy Prilosec OTC, consumers did not need to

24

pay for a doctor visit to get a prescription. Moreover, when Prilosec OTC was introduced, it cost less than generic omeprazole. Wal. FAC ¶ 105; La. FAC ¶ 107. None of this is anti-competitive. It gave consumers more choices.

Plaintiffs also complain that most managed care organizations ("MCOs") stopped covering prescriptions for Prilosec (either branded or generic) after Prilosec OTC became available. Wal. FAC ¶ 97; La. FAC ¶ 99. Even if this statement were true – and it is not[7] – there is no allegation that the purported refusal by MCOs to cover the generic omeprazole was the result of any *agreements* between AstraZeneca and the MCOs. In antitrust parlance, there is no allegation of agreements that "foreclosed" AstraZeneca's competitors. Hence, this case is unlike *Microsoft* and other foreclosure decisions.[8]

Plaintiffs' claim fails because each MCO was free to make its own decision about whether to cover (reimburse for) generic omeprazole – or, for that matter, whether to cover Nexium. If, as plaintiffs allege, those coverage decisions caused doctors to choose a more expensive medicine, then the MCOs had strong incentives to consider their coverage decisions carefully, for they were paying the bills. Moreover, the manufacturers of generic omeprazole were free to present their case to the MCOs that covering their products would save money. So too were *plaintiffs* – who, after all, include huge chains of retail drug stores that belong to the

---

[7] The allegation that MCOs stopped covering generic omeprazole is manifestly false, and its falsity can be demonstrated with minimal discovery. Therefore, were the Court to conclude that this allegation keeps plaintiffs' case alive, discovery should be limited to this point.

[8] In *United States v. Microsoft Corp.*, 253 F.3d 34, 70-74 (D.C. Cir. 2001), the court found that Microsoft maintained its Windows monopoly by including restrictions in the license agreement with *every* computer manufacturer and by "exclusive deals" with 14 of the top 15 Internet access providers. *See also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190-191 (3d Cir. 2005) (finding that dominant artificial tooth manufacturer maintained its monopoly by entering into agreements with "key dealers" who agreed "not to handle competitors' [artificial] teeth").

MCOs' pharmacy networks and that deal with them on a daily basis. The complaints do not allege any actions by AstraZeneca that foreclosed its generic competitors or the plaintiffs from pressing their case that the MCOs could reduce their outlays on Nexium if they covered generic omeprazole.

Plaintiffs' claim also fails because the complaints do not allege any harm to *consumers*. On the contrary, they affirmatively allege that because there is supposedly "no coverage for prescription Prilosec, whether brand or generic," physicians "confer a financial benefit on the patient by prescribing Nexium rather than . . . writing a prescription for Prilosec." Wal. FAC ¶ 102; La. FAC ¶ 104. When consumers benefit, there can be no antitrust violation. As the D.C. Circuit pointed out, "to be condemned as exclusionary, a monopolist's act must . . . harm the competitive process *and thereby harm consumers*." *Microsoft*, 253 F.3d at 58 (emphasis added).

The gist of plaintiffs' claim is that AstraZeneca's products were better able to meet the needs of consumers in today's managed care marketplace, where drug choices may be influenced by the coverage policies of MCOs. Plaintiffs allege that Prilosec OTC was attractive because it was available without a doctor visit and often cheaper, while Nexium was attractive because it was covered by the MCOs. There is simply nothing unlawful about competing by offering additional and attractive products; that is the essence of the very competitive process which the Sherman Act is designed to promote. *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir. 1979); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287 (2d Cir. 1979).

After alleging that it was anti-competitive for AstraZeneca to introduce Prilosec OTC, plaintiffs contradict themselves by alleging that it was anti-competitive for AstraZeneca *not* to manufacture the product in sufficient quantities "to meet the market demands." Wal. FAC

¶ 103; La. FAC ¶ 105.  Plaintiffs, however, cannot state a Section 2 violation by alleging that "shortages" of Prilosec OTC caused "Prilosec OTC patients to see their physicians to obtain a prescription for Nexium."  *Id.*  At most, the alleged shortages could have resulted in a temporary increase in the sales of Nexium and other PPIs.[9]  This is certainly not enough to achieve or maintain a monopoly.  Such short-term gains are not the concern of Section 2.  As the Ninth Circuit has stated:

> We therefore insist on a "preliminary showing of significant and more-than-temporary harmful effects on competition (and not merely upon a competitor or customer)" before these practices can rise to the level of exclusionary conduct.

*American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal & Prof. Testing Pubs., Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997), *quoting* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 737b, at 278 (1978).  *Accord Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990) (conduct is not exclusionary unless it "reasonably appears capable of making a significant contribution to creating or maintaining monopoly power") (Breyer, C.J.); *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 697 (10th Cir. 1989).

## III.    The Allegations of Deceptive Advertising Are Not Sufficient to State an Antitrust Claim.

Plaintiffs' fraud allegations should be rejected for three independent reasons: first, because fraud has not been pleaded with the particularity required by Rule 9(b); second, because the allegedly misleading statements do not satisfy the elements required to state a claim

---

[9] As another court noted:  "during the period from August until October of 2004, a shortage of Prilosec OTC, another PPI, resulted in an increase in sales of Prevacid."  *AstraZeneca LP v. TAP Pharm. Prods., Inc.*, No. 04-1332-KAJ, 2006 U.S. Dist. LEXIS 40620, at *11 (May 18, 2006).

under Section 2 of the Sherman Act; and third, because the FDA's approval of the Nexium

labeling precludes an antitrust challenge to product claims supported by that labeling.

### A.    The Allegations of Deceptive Advertising Should Be Disregarded Because of the Failure to Plead Fraud with Particularity.

The complaints contain "averments of fraud," and therefore plaintiffs have an

obligation to set forth "the circumstances constituting fraud . . . with particularity."  Rule 9(b),

Fed. R. Civ. P.  Any averments of fraud that are not pleaded with the requisite particularity are to

be disregarded when ruling on a motion to dismiss under Rule 12(b)(6).  *Lone Star Ladies Inv.

Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) ("The proper route is to disregard

averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been

stated"); *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1105 (9th Cir. 2003) (same).

Rule 9(b) certainly applies here.  In their original complaints, plaintiffs expressly

accused AstraZeneca of a "fraudulent and misleading campaign."  Wal. Cmplt. ¶ 58; La. Cmplt.

¶ 61.  The amended complaints no longer use the word "fraud," but instead refer to

"misrepresentations" and a "deceptive campaign of distortions and misdirections."  Wal. FAC

¶¶ 69, 90, 91, 116, 122; La. FAC ¶¶ 71, 92, 93, 118, 123.  These are "averments of fraud" within

the meaning of Rule 9(b).  *See*, *e.g.*, *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (Rule

9(b) "is not limited to allegations styled or denominated as fraud"); *Cal. Pub. Employees' Ret.

Sys. v. Chubb Corp.*, 394 F.3d 126, 160-61 (3d Cir. 2004) (Rule 9(b) applies if claim has

"fraudulent underpinnings"); *Borsellino v. Goldman Sachs Group, Inc.,* 2007 WL 509385, at *3

(7th Cir. 2007) (Rule 9(b) applies to tortious interference claim); *Vess*, 317 F.3d at 1103 (Rule

9(b) applies to unfair competition claims).

To satisfy Rule 9(b), "plaintiff must plead the circumstances constituting fraud in

detail – the 'who, what, when, where, and how. . .'" *DiLeo v. Ernst & Young*, 901 F.2d 624, 626

(7th Cir. 1990).  Rule 9(b) "require[s] that 'the pleader . . . state the time, place and content of the false representations, the fact misrepresented and what was retained or given up as a consequence of the fraud.'"  *United States v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004), *quoting Kowal v. MCI Comm. Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994). The complaints in this case do not come remotely close to meeting these requirements.

   <u>Who</u>.  The complaints do not identify either the speakers or the listeners.  An example is the allegation of deceptive *oral* statements made by AstraZeneca's "sales force" to "doctors who work for managed care organizations."  Wal. FAC ¶ 91; La. FAC ¶ 93.  This allegation is extraordinarily vague, and that lack of particularity is not cured elsewhere in the complaints.  Yet, the identity of these doctors is important, for it is clear that many doctors working for managed care organizations are enormously sophisticated in these matters of gastroenterology and could not have been deceived by AstraZeneca's alleged statements.

   <u>When</u>.  The complaints fail to specify the time or times when the alleged statements were made.  In this case, the dates are particularly important.  As explained below, only fraudulent statements that are "continued for prolonged periods" are actionable under Section 2.  Also, to the extent that plaintiffs are relying on statements made when Nexium was launched in 2001, those statements are well outside the four-year antitrust statute of limitations. *See* Clayton Act § 4b, 15 U.S.C. § 15b.

   <u>Where</u>.  The complaints say nothing about the places where the alleged statements were made.  They refer vaguely to "printed advertisements directed to doctors and patients," but fail to provide any identifying information about the publications where these advertisements were found.  Wal. FAC ¶ 92; La. FAC ¶ 94.  Moreover, the distinction between "doctors and patients" is critical.  As explained below, advertising directed at physicians cannot possibly satisfy the Areeda-Turner test.

_What_.  The complaints fail to state with particularity what AstraZeneca allegedly said.  At most, the complaints quote tiny snippets, without ever providing even a single complete sentence.  _See_ Wal. FAC ¶¶ 91-92; La. FAC ¶¶ 93-94.  This cavalier approach to Rule 9(b) is especially egregious considering that plaintiffs' central argument is _not_ that these statements were false, but rather that they were "distortions and misdirections" because of the "context."  Wal. FAC ¶ 92; La. FAC ¶ 94.  The complaints, however, fail to provide this "context."  Moreover, plaintiffs never make it clear whether they are alleging that AstraZeneca _explicitly_ said Nexium was "superior to Prilosec," or whether that is merely plaintiffs' characterization of the ads.  _See_ Wal. FAC  ¶ 92; La. FAC ¶ 94.  As noted earlier, Chief Judge Robinson "did not find any explicit statements that Nexium was 'superior' to Prilosec" in her "review of the advertising materials of record."[10]

To satisfy Rule 9(b), plaintiffs must describe the specific advertisements that they claim are fraudulent.  As the D.C. Circuit explained in a case involving allegedly fraudulent cigarette advertisements:

> It is safe to assume that both Plaintiff and Defendant know that Defendant has advertised cigarettes for many years. . . .  That is not sufficient, however, to dispel the particularity requirement.  Plaintiff must refer to

---

[10] _PEBTF_, 2005 WL 2993937, at *5.  The complaint in that case reproduced 12 advertisements and quoted at some length from four television advertisements.  All of this material is publicly available on PACER.  _See_ Consolidated Class Action Complaint, _Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc._, No. 05-075-SLR (D. Del. 2005) (Dkt. No. 20).  Evidently plaintiffs have made the strategic choice not to plead fraud with any specificity.  They should not be rewarded for flouting the rule.  It should be noted that two other courts have dismissed state-law claims substantially identical to those in _PEBTF_.  _See Prohias v. AstraZeneca Pharms. L.P._, No. 05-2433-CA-30 (Fla. Cir. Ct. Oct. 11, 2006, appeal pending); _Milum v. AstraZeneca Pharms. L.P.,_ No. CV 2004-77 (Ark. Cir. Ct. May 24, 2006) (motion to reconsider pending).  Two state courts have denied AstraZeneca's motions to dismiss.  _Ledwick v. AstraZeneca Pharms. LP_, No. BC 324518 (Cal. Super. Ct. Sept. 21, 2005); _Commonwealth Care Alliance v. AstraZeneca Pharms. LP_, No. 05-0269 (Mass. Sup. Ct. Oct. 17, 2005).

some *specific advertisements* that he and his Decedent were likely to have
seen when they began and continued to smoke.

*Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 460 (D.C. Cir. 1997) (emphasis added).

*See also Barr Labs., Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 118 (E.D.N.Y. 1993)

(dismissing Lanham Act complaint that failed to "specify what falsehoods or misrepresentations,

if any, were contained in the product labels or in the promotional literature").

Because the averments of fraud in the complaints are utterly lacking in specificity,

they should be disregarded.

### B. Plaintiffs' Deceptive Advertising Allegations Are Insufficient to State a Section 2 Claim.

The Sherman Act is an antitrust law, not an anti-fraud law.  Its treble damage

remedy is reserved for "predatory or exclusionary acts or practices that have the effect of

preventing or excluding competition within the relevant market."  *Morris Comm. Corp. v. PGA*

*Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004).  *Accord United States v. Microsoft Corp.*, 253

F.3d 34, 58 (D.C. Cir. 2001).  Most business torts do not have such an impact.  "Even an act of

pure malice by one business competitor against another does not, without more, state a claim

under the federal antitrust laws; those laws do not create a federal law of unfair competition or

'purport to afford remedies for all torts.'" *Brooke Group Ltd. v. Brown & Williamson Tobacco*

*Corp.*, 509 U.S. 209, 225 (1993) (citation omitted).

In particular, when an antitrust claim is based on claims of deceptive advertising

or speech, the plaintiff "must overcome a presumption that such advertising or speech had a *de*

*minimis* effect on competition."  *American Society of Certified Podiatric Physicians & Surgeons*

*v. American Board of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 & n.7 (6th Cir. 2003).  *Accord*,

*National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988) (quoting

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288 n.41 (2d Cir. 1979); *American*

*Professional Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof. Testing Pubs., Inc.*,

108 F.3d 1147, 1152 (9th Cir. 1997).

      The courts have adopted a stringent test for determining whether alleged

deception or disparagement rises to the level sufficient to constitute a violation of Section 2.

This test was originally set forth in the treatise of Professors Areeda and Turner.[11]  To overcome

the presumption that advertising and speech have a *de minimis* effect on competition, plaintiffs

are required to show "that the representations were [1] clearly false, [2] clearly material, [3]

clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject

matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or

other offset by rivals."  3 P. Areeda & D. Turner *Antitrust Law* ¶ 738a, at 278-79 (1978).  This

six-part test has been widely adopted by the courts, which have emphasized that a plaintiff "must

satisfy *all* six elements," or else it "fails to prove its claim."  *American Professional Testing*

*Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof. Testing Pubs., Inc.*, 108 F.3d 1147, 1152

(9th Cir. 1997) (emphasis in original).  *Accord National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*,

850 F.2d 904, 916 (2d Cir. 1988); *Applera Corp. v. MJ Research Inc.*, 239 F. Supp. 2d 338, 344

(D. Conn. 2004); *Tate v. Pacific Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1079-80 (N. D. Cal.

2002); *In re Indep. Serv. Orgs. Antitrust Litig.*, 114 F. Supp. 2d 1070, 1095-96 (D. Kan. 2000);

*Multivideo Labs, Inc. v. Intel Corp.*, No. 99-3908, 2000 WL 12122, at *15 (S.D.N.Y. 2000); *In*

*re Warfarin Sodium Antitrust Litig.*, No. 98-1232, 1998 WL 883469, at *10 (D. Del. 1998),

---

[11] The Areeda treatise is widely regarded as *the* authority on antitrust law.  As Justice Breyer observed:  "No wonder that most practitioners would prefer to have two paragraphs of Areeda's treatise on their side than three Courts of Appeals or four Supreme Court justices."  S. Breyer, *In Memoriam:  Phillip E. Areeda*, 109 Harv. L. Rev. 889, 890 (1996).

*reversed on other grounds*, 214 F.3d 395 (3d Cir. 2000); *David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 749 (S.D. Tex. 1998).

In this case, the allegations of deception are plainly insufficient as a matter of law to state a Section 2 claim. They fail to satisfy at least four of the six required elements.

### 1.    The advertising was not "clearly false."

Plaintiffs do not even allege that AstraZeneca's statements were false – let alone "clearly false." In fact, plaintiffs never dispute the truth of the advertising snippets they quote. They do not deny that Nexium was an "effective first-line PPI therapy" with "[p]roven efficacy in short-term healing" of EE and "[p]roven symptom control." Nor do plaintiffs deny that the claims made by AstraZeneca find support in the clinical studies described in the FDA-approved label for Nexium.

Instead of alleging falsehoods, plaintiffs assert that "[t]he claims made by AstraZeneca to doctors and consumers were distortions and misdirections." Wal. FAC ¶ 93; La. FAC ¶ 95. These adjectives are not enough to support a monopolization claim. The Sixth Circuit has squarely held that a Section 2 claim cannot be based on statements that were allegedly misleading but nevertheless true:

> Advertising that is "true but misleading" cannot be said to be strictly procompetitive. However, the Supreme Court has cautioned that we should be mindful of the chilling effect antitrust liability can have on permissible competitive conduct. [Citations omitted.] Permitting antitrust liability for merely potentially misleading or "true but misleading statements" would chill procompetitive conduct.

*American Society of Certified Podiatric Physicians & Surgeons v. American Board of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 & n.7 (6th Cir. 2003).

### 2.    Any "puffery" in the advertising was not "clearly likely to induce reasonable reliance."

Plaintiffs allege that AstraZeneca referred to Nexium as "a better PPI," "the powerful new PPI," and "superior to Prilosec." Wal. FAC ¶¶ 91-92; La. FAC ¶¶ 93-94. Even assuming these statements appeared in any advertisements, they are at most mere puffery of the kind that is *not* "clearly likely to induce reasonable reliance." As the Second Circuit pointed out, "in its advertising, a producer is ordinarily permitted, much like an advocate at law, to bathe his cause in the best light possible." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288 (2d Cir. 1979). To be actionable under Section 2, "[t]he alleged false statement or misrepresentation must amount to more than mere puffery." *David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 749 (S.D. Tex. 1998). Indeed, even when the stringent antitrust standards do not apply, courts consistently view such "general claims of superiority" as non-actionable puffery. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000); *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945-46 (3d Cir. 1993). For example, in *Adamson v. Ortho-McNeil Pharm., Inc.*, No. 06-866, 2007 WL 604790, at *4 (D.N.J. Feb. 20, 2007), the court held that advertising a drug as "one-of-a-kind" and "unique" was unactionable puffery. Allegations that would fail to state a claim under statutes that are targeted at false advertising (such as state consumer fraud statutes or the Lanham Act) do not remotely state a claim under the Sherman Act.

### 3.    Doctors and MCOs are not "without knowledge of the subject matter."

Advertising directed at doctors and managed care organizations cannot give rise to a Section 2 claim because they are not in the class of persons who are "without knowledge of the subject matter." This is a strict test. For advertising to be actionable under Section 2, it must

be directed at "ignorant buyers."  3A P.E. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 782a (Supp. 2005).  For instance, in *Tate v. Pacific Gas & Elec. Co.*, 230 F. Supp. 2d 1072, (N. D. Cal. 2002), the court dismissed an antitrust complaint based on alleged misrepresentations about portable gas liquification machines.  The court ruled that the potential purchasers of such devices were "sufficiently sophisticated so as not to be fooled easily by [defendant's] misinformation. . . .  In the marketplace of ideas, there is competition and competing information."  *Id*. at 1080.

When it comes to prescription drugs, physicians obviously do not fall in the class of "ignorant buyers" who are "without knowledge of the subject matter."  Indeed, the very reason why *prescriptions* are required for these drugs is that physicians have the education and training to select among therapeutic alternatives.  Likewise, managed care organizations cannot be described as "without knowledge" about pharmaceutical products.  MCOs maintain drug "formularies" in which they classify drugs as "preferred," "non-preferred" or (worst of all for the manufacturer) "non-formulary."  *See Abbott Labs. v. Andrx Pharms., Inc.*, No. 05 C 1490, U.S. Dist. LEXIS 10846, at *47 (N.D. Ill. June 3, 2005).  It is common for them to have "Pharmacy & Therapeutics Committees" that "review each drug for safety, efficacy and cost."  *See In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 603 (S.D.N.Y. 2005).  Thus, neither the physicians nor the insurers are "without knowledge of the subject matter."

### 4.    The advertising of Nexium was "susceptible of neutralization or other offset."

Finally, plaintiffs' attempt to base a Sherman Act claim on AstraZeneca's advertising for Nexium should be rejected because of the many ways in which misleading advertising would be subject to "neutralization or other offset."

Drug manufacturers are required to submit their advertising materials to the FDA at the time they are first used, and as pointed out above, the FDA has numerous options for addressing advertising that is inconsistent with the FDA-approved label or otherwise does not measure up to the FDA's requirements.  Further safeguards against misleading statements come from the many sources of information about prescription drugs available to doctors, MCOs and their Pharmacy & Therapeutics Committees.  Prescription drugs are a frequent topic at medical gatherings.  Indeed, as the complaints themselves allege, in a widely-reported speech to the American Medical Association convention in 2003,[12] a federal government employee told the doctors, "You should be embarrassed if you prescribe Nexium," and claimed it is "the same drug" as Prilosec.  Wal. FAC ¶ 94; La. FAC ¶ 96.  While AstraZeneca disagrees with these statements, the plaintiffs' own allegations establish that any advertising was susceptible to neutralization or offset.

Competitors are another avenue for neutralizing allegedly misleading claims about a drug's efficacy.  Plaintiffs point out that "brand manufacturers . . . employ large forces of sales representatives, known as 'detailers,' who visit physicians' offices in an effort to persuade physicians to prescribe the manufacturer's products."  Wal. FAC ¶ 21; La. FAC ¶ 23.  Thus, doctors were visited not only by AstraZeneca's detailers, but also by those from the makers of the other PPIs that treat the same conditions (Prevacid, Protonix and Aciphex).  If AstraZeneca were to overstate the benefits of Nexium, its rivals' detailers would point that out when calling on doctors.  Finally, a physician's own education, training, and actual clinical experience with patients provide other sources of neutralization.  The many sources of information about

---

[12] *See*, *e.g.*, Robert Pear, "U.S. Limiting Costs of Drugs for Medicare," N.Y. Times (April 21, 2003); Gardiner Harris, "The Nation:  Prescription Drugs Filled; If Americans Want to Pay Less for Drugs, They Will," N.Y. Times (Nov. 16, 2003).

Nexium's efficacy demonstrate that the antitrust laws need not be invoked to police Nexium's advertising.

In sum, the complaints fail to satisfy four of the six requirements for treating allegedly deceptive statements as a sufficient threat to competition to come within the scope of Section 2. The statements were not "clearly false"; they were at most mere puffery and not "clearly likely to induce reasonable reliance"; most of the statements were made to physicians and managed care organizations that were "not without knowledge of the subject matter"; and, in any event, the statements were "susceptible of neutralization or other offset" by the FDA, doctors, critics and competing drug manufacturers. As a matter of law, plaintiffs' allegations fail to state a claim under Section 2.

### C.    Sherman Act Liability Cannot Be Based on Statements Consistent with the FDA-Approved Label.

There is another compelling reason why the Court should not permit plaintiffs' allegations of misrepresentations to go forward under the guise of a Sherman Act claim. Congress has adopted a comprehensive scheme for the regulation of pharmaceutical marketing that permits drug manufacturers to advertise their products in a manner that is supported by their FDA-approved labeling. To the extent plaintiffs have identified any particular aspect of the marketing of Nexium that they seek to challenge, it is marketing that is supported by the FDA-approved labeling of Nexium and therefore cannot be the basis of a false advertising claim. This Court should hold that Sherman Act liability cannot be predicated on allegations that a label approved by the FDA, or advertising statements that are supported by the label, are misleading and exclusionary.

Under federal law, the FDA is responsible for the labeling of prescription drugs. "Before a new drug may be introduced into interstate commerce, the FDA must approve . . . the

'labeling proposed to be used' for the drug." *In re Canadian Import Antitrust Litig.*, 470 F.3d

785, 789 (8th Cir. 2006), *quoting* 21 U.S.C. § 355(b)(1)(F). Moreover "the labeling

requirements . . . work in conjunction with the other statutory standards and FDA regulations to

create a system that . . . ensures that approved prescription drugs are 'subject to FDA oversight.'"

*Id*. In particular, the FDA may not approve a drug unless it first concludes that the labeling is

not "false or misleading." 21 C.F.R. § 314.125(b)(6).

The "FDA carefully controls the content of labeling for a prescription drug" to

ensure that it "reflects thorough FDA review of the pertinent scientific evidence and

communicates to health care practitioners the agency's formal, authoritative conclusions" about

the drug's safe and effective use. FDA, *Requirements on Content and Format of Labeling for*

*Human Prescription Drug and Biological Products*, 71 Fed. Reg. 3922, 3968 (Jan. 24, 2006).

An approved label "communicates the conclusions of FDA review of the data" in the application

for the drug and reflects specific authorization to market the drug "consistent[ly] with its

approved labeling." FDA, *Professional Product Labeling*, 60 Fed. Reg. at 52,196 (Oct. 5, 1995);

*see also* 21 U.S.C. § 352(n); 21 C.F.R. § 202.1.

Courts applying the antitrust laws should not second-guess the FDA's labeling

decisions, just as the courts have repeatedly refused to consider false-and-misleading claims

under the Lanham Act when the statements at issue were supported by FDA-approved labels.

*E.g.*, *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (9th Cir. 1990) ("[T]he

issue of whether an ingredient is properly labeled 'active' or 'inactive' under FDA standards is

not properly decided . . . in a Lanham Act case."); *Cytyc Corp. v. Neuromedical Systems, Inc.*, 12

F. Supp. 2d 296, 301 (S.D.N.Y. 1998) ("representations by [defendant] that comport

substantively with statements approved as accurate by the FDA cannot supply the basis for

[plaintiff's] claims"); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-*

*Merck Consumer Pharm. Co.*, Nos. 95-7011, 95-7688, 1996 WL 280810, at *13 (S.D.N.Y. 1996) (refusing to "substitute this Court's discretion for that of the FDA in approving package labeling"); *American Home Products Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 145 (S.D.N.Y. 1987) (FDA approval of statements is defense to Lanham Act claim).

It is significant that in both of the pharmaceutical cases where antitrust claims were based on allegedly false representations by drug manufacturers, the FDA itself had previously determined that the defendants' statements were misleading. *See In re Warfarin Sodium Antitrust Litig.*, No. 98-1232, 1998 WL 883469, at *4 (D. Del. 1998), *reversed on other grounds*, 214 F.3d 395 (3d Cir. 2000) (noting that "[t]he FDA admonished the defendant for its assertions," finding them to be "misleading"); *National Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988) (finding that "the FDA found the Letter to be false and misleading"). Those lawsuits raised antitrust claims that were *based on* FDA determinations.[13]

Here, by contrast, the plaintiffs are effectively impugning the determinations made by the FDA. They seek, for example, to rewrite the summary of the clinical test results that the FDA reviewed and approved, and then use their own analysis of the test results as a basis to attack the marketing of Nexium. Compare, *e.g.*, Wal. FAC ¶ 78; La. FAC ¶ 80 with Exhibit A (FDA-approved Nexium label), pp. 13-14. The FDA approved a maximum dose of 40 mg of Nexium, and further approved labeling that summarized studies that showed, for example and in plaintiffs' words, "a small therapeutic gain" over the maximum dose of Prilosec for the healing of EE and "a moderate difference in healing rates of EE in favor of 40 mg Nexium over 20 mg Prilosec." Wal FAC ¶¶ 80, 83; La. FAC ¶¶ 82, 85. Plaintiffs want to re-fight a battle they admit

---

[13] Also, neither of these cases involved statements made to doctors. *Warfarin* involved advertising directed at consumers (1998 WL 883469, at *11), and *National Ass'n of Pharm. Mfrs.* involved an unlawful "attempt to intimidate pharmacists." 850 F.2d at 908.

was already waged within the FDA over whether the agency should approve a 40 mg dose of

Nexium and whether the results of the clinical tests are clinically "meaningful." The Food, Drug

and Cosmetic Act affords them a citizen petition for this purpose.[14] They should not be

permitted to do so under the guise of an antitrust suit.

For all of these reasons, plaintiffs' allegations of deceptive advertising are

insufficient to state a claim under the Sherman Act.

## CONCLUSION

All of the complaints should be dismissed under Rules 12(b)(6) and 9(b) for

failure to state a claim upon which relief may be granted.

Dated: April 6, 2007

Respectfully submitted,

By:____/s/Mark E. Haddad_____

John W. Treece
David M. Schiffman
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
(312) 853-7000
(312) 853-7036 (fax)

Mark E. Haddad (D.C. Bar No. 442547)
Joshua E. Anderson
Alycia A. Degen
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, California 90013
(213) 896-6000
(213) 896-6600 (fax)

*Attorneys for Defendants*

---

[14] 21 C.F.R. § 10.25(a); 21 C.F.R. § 10.30.

# Exhibit A

# FDA APPROVAL LABELING 2/14/01

**APPEARS THIS WAY
ON ORIGINAL**

revised 2/14/01

# NEXIUM™

*(esomeprazole magnesium)*
**DELAYED-RELEASE CAPSULES**

Rx only

## DESCRIPTION

The active ingredient in NEXIUM™ (esomeprazole magnesium) Delayed-Release Capsules is bis(5-methoxy-2-[(S)-[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole-1-yl) magnesium trihydrate, a compound that inhibits gastric acid secretion. Esomeprazole is the S-isomer of omeprazole, which is a mixture of the S- and R- isomers. Its empirical formula is $(C_{17}H_{18}N_3O_3S)_2Mg \times 3 H_2O$ with molecular weight of 767.2 as a trihydrate and 713.1 on an anhydrous basis. The structural formula is:



The magnesium salt is a white to slightly colored crystalline powder. It contains 3 moles of water of solvation and is slightly soluble in water.

**APPEARS THIS WAY
ON ORIGINAL**

The stability of esomeprazole magnesium is a function of pH; it rapidly degrades in acidic media, but it has acceptable stability under alkaline conditions. At pH 6.8 (buffer), the half-life of the magnesium salt is about 19 hours at 25°C and about 8 hours at 37°C.

NEXIUM is supplied as Delayed-Release Capsules for oral administration. Each delayed-release capsule contains 20 mg or 40 mg of esomeprazole (present as 22.3 mg or 44.5 mg esomeprazole magnesium trihydrate) in the form of enteric-coated pellets with the following inactive ingredients: glyceryl monostearate 40-50, hydroxypropyl cellulose, hydroxypropyl methylcellulose, magnesium stearate, methacrylic acid copolymer type C, polysorbate 80, sugar spheres, talc, and triethyl citrate. The capsule shells have the following inactive ingredients: gelatin, FD&C Blue #1, FD&C Red #40, D&C Red #28, titanium dioxide, shellac, ethyl alcohol, isopropyl alcohol, n-butyl alcohol, propylene glycol. sodium hydroxide, polyvinyl pyrrolidone, and D&C Yellow #10.

## CLINICAL PHARMACOLOGY
### Pharmacokinetics
*Absorption*
NEXIUM Delayed-Release Capsules contain an enteric-coated pellet formulation of esomeprazole magnesium. After oral administration peak plasma levels ($C_{max}$) occur at approximately 1.5 hours ($T_{max}$). The $C_{max}$ increases proportionally when the dose is increased, and there is a three-fold increase in the area under the plasma concentration-time curve (AUC) from 20 to 40 mg. At repeated once-daily dosing with 40 mg, the systemic bioavailability is approximately 90% compared to 64% after a single dose of 40 mg. The mean exposure (AUC) to esomeprazole increases from 4.32 μmol*hr/L on day 1 to 11.2 μmol*hr/L on day 5 after 40 mg once daily dosing.

APPEARS THIS WAY
ON ORIGINAL

2

The AUC after administration of a single 40 mg dose of esomeprazole is decreased by 33-53% after food intake compared to fasting conditions. Esomeprazole should be taken at least one hour before meals.

The pharmacokinetic profile of esomeprazole was determined in 36 patients with symptomatic gastroesophageal reflux disease following repeated once daily administration of 20 mg and 40 mg capsules of NEXIUM over a period of five days. The results are shown in the following table:

**Pharmacokinetic Parameters of NEXIUM Following Oral Dosing for 5 days**

| Parameter | NEXIUM 40 mg | NEXIUM 20 mg |
|---|---|---|
| AUC ($\mu$mol•h/L) | 12.6 | 4.2 |
| Coefficient of variation | 42% | 59% |
| $C_{max}$ ($\mu$mol/L) | 4.7 | 2.1 |
| $T_{max}$ (h) | 1.6 | 1.6 |
| $t_{1/2}$ (h) | 1.5 | 1.2 |

Values represent the geometric mean, except the $T_{max}$ which is the arithmetic mean.

*Distribution*

Esomeprazole is 97% bound to plasma proteins. Plasma protein binding is constant over the concentration range of 2-20 $\mu$mol/L. The apparent volume of distribution at steady state in healthy volunteers is approximately 16 L.

**APPEARS THIS WAY ON ORIGINAL**

3

## Metabolism

Esomeprazole is extensively metabolized in the liver by the cytochrome P450 (CYP) enzyme system. The metabolites of esomeprazole lack antisecretory activity. The major part of esomeprazole's metabolism is dependent upon the CYP2C19 isoenzyme, which forms the hydroxy and desmethyl metabolites. The remaining amount is dependent on CYP3A4 which forms the sulphone metabolite. CYP2C19 isoenzyme exhibits polymorphism in the metabolism of esomeprazole, since some 3% of Caucasians and 15-20% of Asians lack CYP2C19 and are termed Poor metabolizers. At steady state, the ratio of AUC in Poor metabolizers to AUC in the rest of the population (Extensive metabolizers) is approximately 2.

Following administration of equimolar doses, the S- and R-isomers are metabolized differently by the liver, resulting in higher plasma levels of the S- than of the R-isomer.

## Excretion

The plasma elimination half-life of esomeprazole is approximately 1-1.5 hours. Less than 1% of parent drug is excreted in the urine. Approximately 80% of an oral dose of esomeprazole is excreted as inactive metabolites in the urine, and the remainder is found as inactive metabolites in the feces.

## Special Populations

### Geriatric

The AUC and $C_{max}$ values were slightly higher (25% and 18%, respectively) in the elderly as compared to younger subjects at steady state. Dosage adjustment based on age is not necessary.

### Pediatric

The pharmacokinetics of esomeprazole have not been studied in patients < 18 years of age.

4

APPEARS THIS WAY
ON ORIGINAL

*Gender*

The AUC and $C_{max}$ values were slightly higher (13%) in females than in males at steady state. Dosage adjustment based on gender is not necessary.

*Hepatic Insufficiency*

The steady state pharmacokinetics of esomeprazole obtained after administration of 40 mg once daily to 4 patients each with mild (Child Pugh Class A), moderate (Child Pugh Class B), and severe (Child Pugh Class C) liver insufficiency were compared to those obtained in 36 male and female GERD patients with normal liver function. In patients with mild and moderate hepatic insufficiency, the AUCs were within the range that could be expected in patients with normal liver function. In patients with severe hepatic insufficiency the AUCs were 2 to 3 times higher than in the patients with normal liver function. No dosage adjustment is recommended for patients with mild to moderate hepatic insufficiency (Child Pugh Classes A and B). However, in patients with severe hepatic insufficiency (Child Pugh Class C) a dose of 20 mg once daily should not be exceeded (See DOSAGE AND ADMINISTRATION).

*Renal Insufficiency*

The pharmacokinetics of esomeprazole in patients with renal impairment are not expected to be altered relative to healthy volunteers as less than 1% of esomeprazole is excreted unchanged in urine.

**APPEARS THIS WAY ON ORIGINAL**

5

**Pharmacokinetics: Combination Therapy with Antimicrobials**

Esomeprazole magnesium 40 mg once daily was given in combination with clarithromycin 500 mg twice daily and amoxicillin 1000 mg twice daily for 7 days to 17 healthy male and female subjects. The mean steady state AUC and $C_{max}$ of esomeprazole increased by 70% and 18%, respectively during triple combination therapy compared to treatment with esomeprazole alone. The observed increase in esomeprazole exposure during co-administration with clarithromycin and amoxicillin is not expected to produce significant safety concerns.

The pharmacokinetic parameters for clarithromycin and amoxicillin were similar during triple combination therapy and administration of each drug alone. However, the mean AUC and $C_{max}$ for 14-hydroxyclarithromycin increased by 19% and 22%, respectively, during triple combination therapy compared to treatment with clarithromycin alone. This increase in exposure to 14-hydroxyclarithromycin is not considered to be clinically significant.

**Pharmacodynamics**
*Mechanism of Action*
Esomeprazole is a proton pump inhibitor that suppresses gastric acid secretion by specific inhibition of the $H^+/K^+$-ATPase in the gastric parietal cell. The S- and R-isomers are protonated and converted in the acidic compartment of the parietal cell forming the active inhibitor, the achiral sulphenamide. By acting specifically on the proton pump, esomeprazole blocks the final step in acid production, thus reducing gastric acidity. This effect is dose-related up to a daily dose of 20 to 40 mg and leads to inhibition of gastric acid secretion.

APPEARS THIS WAY
ON ORIGINAL

6

*Antisecretory Activity*

The effect of esomeprazole on intragastric pH was determined in patients with symptomatic gastroesophageal reflux disease in two separate studies. In the first study of 36 patients, NEXIUM 40 mg and 20 mg capsules were administered over 5 days. The results are shown in the following table:

**Effect on Intragastric pH On Day 5 (N=36)**

| Parameter | NEXIUM 40 mg | NEXIUM 20 mg |
|---|---|---|
| % Time Gastric pH >4 [†] (Hours) | 70%* (16.8 h) | 53% (12.7 h) |
| Coefficient of variation | 26% | 37% |
| Median 24 Hour pH | 4.9* | 4.1 |
| Coefficient of variation | 16% | 27% |

[†] Gastric pH was measured over a 24-hour period
* p< 0.01 NEXIUM 40 mg vs NEXIUM 20 mg

In a second study, the effect on intragastric pH of NEXIUM 40 mg administered once daily over a five day period was similar to the first study, (% time with pH>4 was 68% or 16.3 hours).

APPEARS THIS WAY
ON ORIGINAL

7

*Serum Gastrin Effects*

The effect of NEXIUM on serum gastrin concentrations was evaluated in approximately 2,700 patients in clinical trials up to 8 weeks and in over 1,300 patients for up to 6-12 months. The mean fasting gastrin level increased in a dose-related manner. This increase reached a plateau within two to three months of therapy and returned to baseline levels within four weeks after discontinuation of therapy.

*Enterochromaffin-like (ECL) Cell Effects*

In 24-month carcinogenicity studies of omeprazole in rats, a dose-related significant occurrence of gastric ECL cell carcinoid tumors and ECL cell hyperplasia was observed in both male and female animals (see **PRECAUTIONS,** Carcinogenesis, Mutagenesis, Impairment of Fertility). Carcinoid tumors have also been observed in rats subjected to fundectomy or long-term treatment with other proton pump inhibitors or high doses of $H_2$-receptor antagonists.

Human gastric biopsy specimens have been obtained from more than 3,000 patients treated with omeprazole in long-term clinical trials. The incidence of ECL cell hyperplasia in these studies increased with time; however, no case of ECL cell carcinoids, dysplasia, or neoplasia has been found in these patients.

In over 1,000 patients treated with NEXIUM (10, 20 or 40 mg/day) up to 6-12 months, the prevalence of ECL cell hyperplasia increased with time and dose. No patient developed ECL cell carcinoids, dysplasia, or neoplasia in the gastric mucosa.

**APPEARS THIS WAY**
**ON ORIGINAL**

8

## Endocrine Effects

NEXIUM had no effect on thyroid function when given in oral doses of 20 or 40 mg for 4 weeks. Other effects of NEXIUM on the endocrine system were assessed using omeprazole studies. Omeprazole given in oral doses of 30 or 40 mg for 2 to 4 weeks had no effect on carbohydrate metabolism, circulating levels of parathyroid hormone, cortisol, estradiol, testosterone, prolactin, cholecystokinin or secretin.

## Microbiology

Esomeprazole magnesium, amoxicillin and clarithromycin triple therapy has been shown to be active against most strains of *Helicobacter pylori* (*H. pylori*) *in vitro* and in clinical infections as described in the **Clinical Studies** and **INDICATIONS AND USAGE** sections.

### Helicobacter

#### Helicobacter pylori

Susceptibility testing of *H. pylori* isolates was performed for amoxicillin and clarithromycin using agar dilution methodology, and minimum inhibitory concentrations (MICs) were determined.

#### Pretreatment Resistance

Clarithromycin pretreatment resistance rate (MIC ≥ 1 µg/mL) to *H. pylori* was 15% (66/445) at baseline in all treatment groups combined. A total of > 99% (394/395) of patients had *H. pylori* isolates which were considered to be susceptible (MIC ≤ 0.25 µg/mL) to amoxicillin at baseline. One patient had a baseline *H. pylori* isolate with an amoxicillin MIC = 0.5 µg /mL.

**APPEARS THIS WAY
ON ORIGINAL**

9

*Clarithromycin Susceptibility Test Results and Clinical/Bacteriologic Outcomes*

The baseline *H. pylori* clarithromycin susceptibility results and the *H. pylori* eradication results at the Day 38 visit are shown in the table below:

**Clarithromycin Susceptibility Test Results and Clinical/Bacteriological Outcomes [a] for Triple Therapy - (Esomeprazole magnesium 40 mg once daily/amoxicillin 1000 mg twice daily/clarithromycin 500 mg twice daily for 10 days)**

| Clarithromycin Pretreatment Results | *H. pylori* negative (Eradicated) | *H. pylori* positive (Not Eradicated) Post-treatment susceptibility results | | | |
|---|---|---|---|---|---|
| | | S[b] | I[b] | R[b] | No MIC |
| Susceptible[b] 182 | 162 | 4 | 0 | 2 | 14 |
| Intermediate[b] 1 | 1 | 0 | 0 | 0 | 0 |
| Resistant[b] 29 | 13 | 1 | 0 | 13 | 2 |

[a] Includes only patients with pretreatment and post-treatment clarithromycin susceptibility test results

[b] Susceptible (S) MIC ≤ 0.25 μg/mL. Intermediate (I) MIC = 0.5 μg/mL. Resistant (R) MIC ≥ 1.0 μg/mL.

Patients not eradicated of *H. pylori* following esomeprazole magnesium/amoxicillin/clarithromycin triple therapy will likely have clarithromycin resistant *H. pylori* isolates. Therefore, clarithromycin susceptibility testing should be done, when possible. Patients with clarithromycin resistant *H. pylori* should not be re-treated with a clarithromycin-containing regimen.

**APPEARS THIS WAY ON ORIGINAL**

*Amoxicillin Susceptibility Test Results and Clinical/Bacteriological Outcomes*

In the esomeprazole magnesium/amoxicillin/clarithromycin clinical trials, 83% (176/212) of the patients in the esomeprazole magnesium/amoxicillin/clarithromycin treatment group who had pretreatment amoxicillin susceptible MICs ($\leq 0.25$ µg/mL) were eradicated of *H. pylori*, and 17% (36/212) were not eradicated of *H. pylori*. Of the 36 patients who were not eradicated of *H. pylori* on triple therapy, 16 had no post-treatment susceptibility test results and 20 had post-treatment *H. pylori* isolates with amoxicillin susceptible MICs. Fifteen of the patients who were not eradicated of *H. pylori* on triple therapy also had post-treatment *H. pylori* isolates with clarithromycin resistant MICs. There were no patients with *H. pylori* isolates who developed treatment emergent resistance to amoxicillin.

*Susceptibility Test for Helicobacter pylori*

The reference methodology for susceptibility testing of *H. pylori* is agar dilution MICs. One to three microliters of an inoculum equivalent to a No.2 McFarland standard ($1 \times 10^7$ - $1 \times 10^8$ CFU/mL for *H. pylori*) are inoculated directly onto freshly prepared antimicrobial containing Mueller-Hinton agar plates with 5% aged defibrinated sheep blood ($\geq 2$ weeks old). The agar dilution plates are incubated at 35°C in a microaerobic environment produced by a gas generating system suitable for *Campylobacter*. After 3 days of incubation, the MICs are recorded as the lowest concentration of antimicrobial agent required to inhibit growth of the organism. The clarithromycin and amoxicillin MIC values should be interpreted according to the following criteria:

APPEARS THIS WAY
ON ORIGINAL

11

| Clarithromycin MIC ($\mu$g/mL) [a] | Interpretation | |
|---|---|---|
| $\leq 0.25$ | Susceptible | (S) |
| 0.5 | Intermediate | (I) |
| $\geq 1.0$ | Resistant | (R) |

| Amoxicillin MIC ($\mu$g/mL) [a,b] | Interpretation | |
|---|---|---|
| $\leq 0.25$ | Susceptible | (S) |

[a] These are breakpoints for the agar dilution methodology and they should not be used to interpret results obtained using alternative methods.

[b] There were not enough organisms with MICs > 0.25 $\mu$g /mL to determine a resistance breakpoint.

Standardized susceptibility test procedures require the use of laboratory control microorganisms to control the technical aspects of the laboratory procedures. Standard clarithromycin and amoxicillin powders should provide the following MIC values:

| Microorganism | Antimicrobial Agent | MIC ($\mu$g/mL) [a] |
|---|---|---|
| *H. pylori* ATCC 43504 | Clarithromycin | 0.016 – 0.12 ($\mu$g/mL) |
| *H. pylori* ATCC 43504 | Amoxicillin | 0.016 – 0.12 ($\mu$g/mL) |

[a] These are quality control ranges for the agar dilution methodology and they should not be used to control test results obtained using alternative methods.

APPEARS THIS WAY
ON ORIGINAL

12

**Clinical Studies**
*Healing of Erosive Esophagitis*

The healing rates of NEXIUM 40 mg, NEXIUM 20 mg, and omeprazole 20 mg (the approved dose for this indication) were evaluated in patients with endoscopically diagnosed erosive esophagitis in four multicenter, double-blind, randomized studies. The healing rates at weeks 4 and 8 were evaluated and are shown in the table below:

Erosive Esophagitis Healing Rate (Life-Table Analysis)

| Study | No. of Patients | Treatment Groups | Week 4 | Week 8 | Significance Level * |
|-------|----------------|------------------|--------|--------|---------------------|
| 1 | 588 | NEXIUM 20 mg | 68.7% | 90.6% | N.S. |
|   | 588 | Omeprazole 20 mg | 69.5% | 88.3% |  |
| 2 | 654 | NEXIUM 40 mg | 75.9% | 94.1% | p < 0.001 |
|   | 656 | NEXIUM 20 mg | 70.5% | 89.9% | p < 0.05 |
|   | 650 | Omeprazole 20 mg | 64.7% | 86.9% |  |
| 3 | 576 | NEXIUM 40 mg | 71.5% | 92.2% | N.S. |
|   | 572 | Omeprazole 20 mg | 68.6% | 89.8% |  |
| 4 | 1216 | NEXIUM 40 mg | 81.7% | 93.7% | p < 0.001 |
|   | 1209 | Omeprazole 20 mg | 68.7% | 84.2% |  |

*log-rank test vs omeprazole 20 mg
N.S. = not significant (p > 0.05).

APPEARS THIS WAY
ON ORIGINAL

13

In these same studies of patients with erosive esophagitis, sustained heartburn resolution and time to sustained heartburn resolution were evaluated and are shown in the table below:

**Sustained Resolution[c] of Heartburn (Erosive Esophagitis Patients)**

| Study | No. of Patients | Treatment Groups | Cumulative Percent[b] with Sustained Resolution | | Significance Level [*] |
|---|---|---|---|---|---|
| | | | Day 14 | Day 28 | |
| 1 | 573 | NEXIUM 20 mg | 64.3% | 72.7% | N.S. |
| | 555 | Omeprazole 20 mg | 64.1% | 70.9% | |
| 2 | 621 | NEXIUM 40 mg | 64.8% | 74.2% | p <0.001 |
| | 620 | NEXIUM 20 mg | 62.9% | 70.1% | N.S. |
| | 626 | Omeprazole 20 mg | 56.5% | 66.6% | |
| 3 | 568 | NEXIUM 40 mg | 65.4% | 73.9% | N.S. |
| | 551 | Omeprazole 20 mg | 65.5% | 73.1% | |
| 4 | 1187 | NEXIUM 40 mg | 67.6% | 75.1% | p <0.001 |
| | 1188 | Omeprazole 20 mg | 62.5% | 70.8% | |

[c]Defined as 7 consecutive days with no heartburn reported in daily patient diary.
[b]Defined as the cumulative proportion of patients who have reached the start of sustained resolution
[*]log-rank test vs omeprazole 20 mg
N.S. = not significant (p > 0.05).

APPEARS THIS WAY
ON ORIGINAL

14

In these four studies, the range of median days to the start of sustained resolution (defined as 7 consecutive days with no heartburn) was 5 days for NEXIUM 40 mg, 7-8 days for NEXIUM 20 mg and 7-9 days for omeprazole 20 mg.

There are no comparisons of 40 mg of NEXIUM with 40 mg of omeprazole in clinical trials assessing either healing or symptomatic relief of erosive esophagitis.

*Long-Term Maintenance of Healing of Erosive Esophagitis*

Two multicenter, randomized, double-blind placebo-controlled 4-arm trials were conducted in patients with endoscopically confirmed, healed erosive esophagitis to evaluate NEXIUM 40 mg (n=174), 20 mg (n=180), 10 mg (n= 168) or placebo (n=171) once daily over six months of treatment.

No additional clinical benefit was seen with NEXIUM 40 mg over NEXIUM 20 mg.

The percentage of patients that maintained healing of erosive esophagitis at the various time points are shown in the figures below:

APPEARS THIS WAY
ON ORIGINAL

15



Maintenance of Healing Rates by Month (Study 177)

s= scheduled visit

APPEARS THIS WAY
ON ORIGINAL

16

**Maintenance of Healing Rates by Month (Study 178)**



s= scheduled visit

Patients remained in remission significantly longer and the number of recurrences of erosive esophagitis was significantly less in patients treated with NEXIUM compared to placebo.

APPEARS THIS WAY
ON ORIGINAL

17

In both studies, the proportion of patients on NEXIUM who remained in remission and were free of heartburn and other GERD symptoms was well differentiated from placebo.

In a third multicenter open label study of 808 patients treated for 12 months with NEXIUM 40 mg, the percentage of patients that maintained healing of erosive esophagitis was 93.7% for six months and 89.4% for one year.

*Symptomatic Gastroesophageal Reflux Disease (GERD)*
Two multicenter, randomized, double-blind, placebo-controlled studies were conducted in a total of 717 patients comparing four weeks of treatment with NEXIUM 20 mg or 40 mg once daily versus placebo for resolution of GERD symptoms. Patients had ≥ 6-month history of heartburn episodes, no erosive esophagitis by endoscopy, and heartburn on at least four of the seven days immediately preceding randomization.

The percentage of patients that were symptom-free of heartburn was significantly higher in the NEXIUM groups compared to placebo at all follow-up visits (Weeks 1, 2, and 4).

No additional clinical benefit was seen with NEXIUM 40 mg over NEXIUM 20 mg.

The percent of patients symptom-free of heartburn by day are shown in the figures below:

APPEARS THIS WAY
ON ORIGINAL

18

Percent of Patients Symptom-Free of Heartburn by Day
(Study 225)



APPEARS THIS WAY
ON ORIGINAL



**Percent of Patients Symptom-Free of Heartburn by Day
(Study 226)**

In three European symptomatic GERD trials, NEXIUM 20 mg and 40 mg and omeprazole 20 mg were evaluated. No significant treatment related differences were seen.

APPEARS THIS WAY
ON ORIGINAL

20

**Helicobacter pylori (H. pylori) Eradication in Patients with Duodenal Ulcer Disease**

*Triple Therapy (NEXIUM/amoxicillin/clarithromycin):* Two multicenter, randomized, double-blind studies were conducted using a 10 day treatment regimen. The first study (191) compared NEXIUM 40 mg once daily in combination with amoxicillin 1000 mg twice daily and clarithromycin 500 mg twice daily to NEXIUM 40 mg once daily plus clarithromycin 500 mg twice daily. The second study (193) compared NEXIUM 40 mg once daily in combination with amoxicillin 1000 mg twice daily and clarithromycin 500 mg twice daily to NEXIUM 40 mg once daily. *H. pylori* eradication rates, defined as at least two negative tests and no positive tests from CLOtest®, histology and/or culture, at 4 weeks post-therapy were significantly higher in the NEXIUM plus amoxicillin and clarithromycin group than in the NEXIUM plus clarithromycin or NEXIUM alone group. The results are shown in the following table:

**APPEARS THIS WAY
ON ORIGINAL**

21

*H. pylori* Eradication Rates at 4 Weeks after 10 Day Treatment Regimen

| Study | Treatment Group | Per-Protocol[†] % of Patients Cured [95% Confidence Interval] (Number of patients) | Intent-to-Treat[‡] |
|---|---|---|---|
| 191 | NEXIUM plus amoxicillin and clarithromycin | 84%* [78, 89] (n=196) | 77%* [71, 82] (n=233) |
|  | NEXIUM plus clarithromycin | 55% [48, 62] (n=187) | 52% [45, 59] (n=215) |
| 193 | NEXIUM plus amoxicillin and clarithromycin | 85%*** [74, 93] (n=67) | 78%** [67, 87] (n=74) |
|  | NEXIUM | 5% [0, 23] (n=22) | 4% [0, 21] (n=24) |

[†] Patients were included in the analysis if they had *H. pylori* infection documented at baseline, had at least one endoscopically verified duodenal ulcer ≥ 0.5 cm in diameter at baseline or had a documented history of duodenal ulcer disease within the past 5 years, and were not protocol violators. Patients who dropped out of the study due to an adverse event related to the study drug were included in the analysis as not *H. pylori* eradicated

[‡] Patients were included in the analysis if they had documented *H. pylori* infection at baseline, had at least one documented duodenal ulcer at baseline, or had a documented history of duodenal ulcer disease, and took at least one dose of study medication. All dropouts were included as not *H. pylori* eradicated.

APPEARS THIS WAY
ON ORIGINAL

22

*p < 0.05 compared to NEXIUM plus clarithromycin
**p < 0.05 compared to NEXIUM alone

The percentage of patients with a healed baseline duodenal ulcer by 4 weeks after the 10 day treatment regimen in the NEXIUM plus amoxicillin and clarithromycin group was 75% (n=156) and 57% (n=60) respectively, in the 191 and 193 studies (per-protocol analysis).

## INDICATIONS AND USAGE

### Treatment of Gastroesophageal Reflux Disease (GERD)
#### *Healing of Erosive Esophagitis*
NEXIUM is indicated for the short-term treatment (4 to 8 weeks) in the healing and symptomatic resolution of diagnostically confirmed erosive esophagitis. For those patients who have not healed after 4-8 weeks of treatment, an additional 4-8-week course of NEXIUM may be considered.

#### *Maintenance of Healing of Erosive Esophagitis*
NEXIUM is indicated to maintain symptom resolution and healing of erosive esophagitis. Controlled studies do not extend beyond 6 months.

#### *Symptomatic Gastroesophageal Reflux Disease*
NEXIUM is indicated for treatment of heartburn and other symptoms associated with GERD.

### *H. pylori* Eradication to Reduce the Risk of Duodenal Ulcer Recurrence
*Triple Therapy (NEXIUM plus amoxicillin and clarithromycin):* NEXIUM, in combination with amoxicillin and clarithromycin, is indicated for the treatment of patients with *H. pylori* infection and duodenal ulcer disease

APPEARS THIS WAY
ON ORIGINAL

23

(active or history of within the past 5 years) to eradicate *H. pylori*. Eradication of *H. pylori* has been shown to reduce the risk of duodenal ulcer recurrence. (See **CLINICAL STUDIES** and **DOSAGE AND ADMINISTRATION**.)

In patients who fail therapy, susceptibility testing should be done. If resistance to clarithromycin is demonstrated or susceptibility testing is not possible, alternative antimicrobial therapy should be instituted. (See **CLINICAL PHARMACOLOGY, Microbiology** and the clarithromycin package insert, **CLINICAL PHARMACOLOGY, Microbiology**.)

## CONTRAINDICATIONS

NEXIUM is contraindicated in patients with known hypersensitivity to any component of the formulation or to substituted benzimidazoles.

Clarithromycin is contraindicated in patients with a known hypersensitivity to any macrolide antibiotic.

Concomitant administration of clarithromycin with pimozide is contraindicated. There have been post-marketing reports of drug interactions when clarithromycin and/or erythromycin are co-administered with pimozide resulting in cardiac arrhythmias (QT prolongation, ventricular tachycardia, ventricular fibrillation, and torsade de pointes) most likely due to inhibition of hepatic metabolism of pimozide by erythromycin and clarithromycin. Fatalities have been reported. (Please refer to full prescribing information for clarithromycin.)

Amoxicillin is contraindicated in patients with a known hypersensitivity to any penicillin. (Please refer to full prescribing information for amoxicillin.)

*APPEARS THIS WAY
ON ORIGINAL*

24

## WARNINGS

**CLARITHROMYCIN SHOULD NOT BE USED IN PREGNANT WOMEN EXCEPT IN CLINICAL CIRCUMSTANCES WHERE NO ALTERNATIVE THERAPY IS APPROPRIATE. IF PREGNANCY OCCURS WHILE TAKING CLARITHROMYCIN, THE PATIENT SHOULD BE APPRISED OF THE POTENTIAL HAZARD TO THE FETUS. (See WARNINGS in prescribing information for clarithromycin.)**

Amoxicillin: Serious and occasionally fatal hypersensitivity (anaphylactic) reactions have been reported in patients on penicillin therapy. These reactions are more apt to occur in individuals with a history of penicillin hypersensitivity and/or a history of sensitivity to multiple allergens.

There have been well documented reports of individuals with a history of penicillin hypersensitivity reactions who have experienced severe hypersensitivity reactions when treated with a cephalosporin. Before initiating therapy with any penicillin, careful inquiry should be made concerning previous hypersensitivity reactions to penicillins, cephalosporins, and other allergens. If an allergic reaction occurs, amoxicillin should be discontinued and the appropriate therapy instituted.

SERIOUS ANAPHYLACTIC REACTIONS REQUIRE IMMEDIATE EMERGENCY TREATMENT WITH EPINEPHRINE. OXYGEN, INTRAVENOUS STEROIDS, AND AIRWAY MANAGEMENT, INCLUDING INTUBATION, SHOULD ALSO BE ADMINISTERED AS INDICATED.

APPEARS THIS WAY
ON ORIGINAL

Pseudomembranous colitis has been reported with nearly all antibacterial agents, including clarithromycin and amoxicillin, and may range in severity from mild to life threatening. Therefore, it is important to consider this diagnosis in patients who present with diarrhea subsequent to the administration of antibacterial agents.

Treatment with antibacterial agents alters the normal flora of the colon and may permit overgrowth of clostridia. Studies indicate that a toxin produced by *Clostridium difficile* is a primary cause of "antibiotic-associated colitis".

After the diagnosis of pseudomembranous colitis has been established, therapeutic measures should be initiated. Mild cases of pseudomembranous colitis usually respond to discontinuation of the drug alone. In moderate to severe cases, consideration should be given to management with fluids and electrolytes, protein supplementation, and treatment with an antibacterial drug clinically effective against *Clostridium difficile colitis*.

## PRECAUTIONS

### General
Symptomatic response to therapy with NEXIUM does not preclude the presence of gastric malignancy.

Atrophic gastritis has been noted occasionally in gastric corpus biopsies from patients treated long-term with omeprazole, of which NEXIUM is an enantiomer.

APPEARS THIS WAY
ON ORIGINAL

26

**Information for Patients**
Patients should be informed of the following:
NEXIUM Delayed-Release Capsules should be taken at least one hour before meals.

For patients who have difficulty swallowing capsules, one tablespoon of applesauce can be added to an empty bowl and the NEXIUM Delayed-Release Capsule can be opened, and the pellets inside the capsule carefully emptied onto the applesauce. The pellets should be mixed with the applesauce and then swallowed immediately. The applesauce used should not be hot and should be soft enough to be swallowed without chewing. The pellets should not be chewed or crushed. The pellet/applesauce mixture should not be stored for future use.

Antacids may be used while taking NEXIUM.

**Drug Interactions**
Esomeprazole is extensively metabolized in the liver by CYP2C19 and CYP3A4.

*In vitro* and *in vivo* studies have shown that esomeprazole is not likely to inhibit CYPs 1A2, 2A6, 2C9, 2D6, 2E1 and 3A4. No clinically relevant interactions with drugs metabolized by these CYP enzymes would be expected. Drug interaction studies have shown that esomeprazole does not have any clinically significant interactions with phenytoin, warfarin, quinidine, clarithromycin or amoxicillin.

APPEARS THIS WAY
ON ORIGINAL

27

Esomeprazole may potentially interfere with CYP2C19, the major esomeprazole metabolizing enzyme. Coadministration of esomeprazole 30 mg and diazepam, a CYP2C19 substrate, resulted in a 45% decrease in clearance of diazepam. Increased plasma levels of diazepam were observed 12 hours after dosing and onwards. However, at that time, the plasma levels of diazepam were below the therapeutic interval, and thus this interaction is unlikely to be of clinical relevance.

Esomeprazole inhibits gastric acid secretion. Therefore, esomeprazole may interfere with the absorption of drugs where gastric pH is an important determinant of bioavailability (eg, ketoconazole, iron salts and digoxin).

Coadministration of oral contraceptives, diazepam, phenytoin, or quinidine did not seem to change the pharmacokinetic profile of esomeprazole.

*Combination Therapy with Clarithromycin*
Co-administration of esomeprazole, clarithromycin, and amoxicillin has resulted in increases in the plasma levels of esomeprazole and 14-hydroxyclarithromycin. (See **CLINICAL PHARMACOLOGY,** Pharmacokinetics: Combination Therapy with Antimicrobials.)

Concomitant administration of clarithromycin with pimozide is contraindicated. (See clarithromycin package insert.)

**Carcinogenesis, Mutagenesis, Impairment of Fertility**
The carcinogenic potential of esomeprazole was assessed using omeprazole studies. In two 24-month oral carcinogenicity studies in rats, omeprazole at daily doses of 1.7, 3.4, 13.8, 44.0 and 140.8 mg/kg/day (about 0.7 to 57 times the human dose of 20 mg/day expressed on a body surface area basis)

APPEARS THIS WAY
ON ORIGINAL

28

produced gastric ECL cell carcinoids in a dose-related manner in both male and female rats; the incidence of this effect was markedly higher in female rats, which had higher blood levels of omeprazole. Gastric carcinoids seldom occur in the untreated rat. In addition, ECL cell hyperplasia was present in all treated groups of both sexes. In one of these studies, female rats were treated with 13.8 mg omeprazole/kg/day (about 5.6 times the human dose on a body surface area basis) for 1 year. then followed for an additional year without the drug. No carcinoids were seen in these rats. An increased incidence of treatment-related ECL cell hyperplasia was observed at the end of 1 year (94% treated vs 10% controls). By the second year the difference between treated and control rats was much smaller (46% vs 26%) but still showed more hyperplasia in the treated group. Gastric adenocarcinoma was seen in one rat (2%). No similar tumor was seen in male or female rats treated for 2 years. For this strain of rat no similar tumor has been noted historically, but a finding involving only one tumor is difficult to interpret. A 78-week mouse carcinogenicity study of omeprazole did not show increased tumor occurrence, but the study was not conclusive.

Esomeprazole was negative in the Ames mutation test. in the *in vivo* rat bone marrow cell chromosome aberration test, and the *in vivo* mouse micronucleus test. Esomeprazole, however, was positive in the *in vitro* human lymphocyte chromosome aberration test. Omeprazole was positive in the *in vitro* human lymphocyte chromosome aberration test, the *in vivo* mouse bone marrow cell chromosome aberration test, and the *in vivo* mouse micronucleus test.

The potential effects of esomeprazole on fertility and reproductive performance were assessed using omeprazole studies. Omeprazole at oral doses up to 138 mg/kg/day in rats (about 56 times the human dose on a body surface area basis) was found to have no effect on reproductive performance of parental animals.

APPEARS THIS WAY
ON ORIGINAL

29

**Pregnancy**

*Teratogenic Effects. Pregnancy Category B*

Teratology studies have been performed in rats at oral doses up to 280 mg/kg/day (about 57 times the human dose on a body surface area basis) and in rabbits at oral doses up to 86 mg/kg/day (about 35 times the human dose on a body surface area basis) and have revealed no evidence of impaired fertility or harm to the fetus due to esomeprazole. There are, however, no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed.

Teratology studies conducted with omeprazole in rats at oral doses up to 138 mg/kg/day (about 56 times the human dose on a body surface area basis) and in rabbits at doses up to 69 mg/kg/day (about 56 times the human dose on a body surface area basis) did not disclose any evidence for a teratogenic potential of omeprazole. In rabbits, omeprazole in a dose range of 6.9 to 69.1 mg/kg/day (about 5.5 to 56 times the human dose on a body surface area basis) produced dose-related increases in embryo-lethality, fetal resorptions, and pregnancy disruptions. In rats, dose-related embryo/fetal toxicity and postnatal developmental toxicity were observed in offspring resulting from parents treated with omeprazole at 13.8 to 138.0 mg/kg/day (about 5.6 to 56 times the human doses on a body surface area basis). There are no adequate and well-controlled studies in pregnant women. Sporadic reports have been received of congenital abnormalities occurring in infants born to women who have received omeprazole during pregnancy.

APPEARS THIS WAY
ON ORIGINAL

30

**Amoxicillin**
*Pregnancy Category B.* See full prescribing information for amoxicillin before using in pregnant women.

**Clarithromycin**
*Pregnancy Category C.* See **WARNINGS** (above) and full prescribing information for clarithromycin before using in pregnant women.

**Nursing Mothers**
The excretion of esomeprazole in milk has not been studied. However, omeprazole concentrations have been measured in breast milk of a woman following oral administration of 20 mg. Because esomeprazole is likely to be excreted in human milk, because of the potential for serious adverse reactions in nursing infants from esomeprazole, and because of the potential for tumorigenicity shown for omeprazole in rat carcinogenicity studies, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use**
Safety and effectiveness in pediatric patients have not been established.

**Geriatric Use**
Of the total number of patients who received NEXIUM in clinical trials, 778 were 65 to 74 years of age and 124 patients were ≥ 75 years of age.

No overall differences in safety and efficacy were observed between the elderly and younger individuals, and other reported clinical experience has not identified differences in responses between the elderly and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

APPEARS THIS WAY
ON ORIGINAL

31

## ADVERSE REACTIONS

The safety of NEXIUM was evaluated in over 10,000 patients (aged 18-84 years) in clinical trials worldwide including over 7,400 patients in the United States and over 2,600 patients in Europe and Canada. Over 2,900 patients were treated in long-term studies for up to 6-12 months. In general, NEXIUM was well tolerated in both short and long-term clinical trials.

The safety in the treatment of healing of erosive esophagitis was assessed in four randomized comparative clinical trials, which included 1,240 patients on NEXIUM 20 mg, 2,434 patients on NEXIUM 40 mg, and 3,008 patients on omeprazole 20 mg daily. The most frequently occurring adverse events ($\geq1\%$) in all three groups was headache (5.5, 5.0, and 3.8, respectively) and diarrhea (no difference among the three groups). Nausea, flatulence, abdominal pain, constipation, and dry mouth occurred at similar rates among patients taking NEXIUM or omeprazole.

Additional adverse events that were reported as possibly or probably related to NEXIUM with an incidence < 1% are listed below by body system:

APPEARS THIS WAY
ON ORIGINAL

32

*Body as a Whole*: abdomen enlarged, allergic reaction, asthenia, back pain, chest pain, chest pain substernal, facial edema, peripheral edema, hot flushes, fatigue, fever, flu-like disorder, generalized edema, leg edema, malaise, pain, rigors; *Cardiovascular*: flushing, hypertension, tachycardia; *Endocrine*: goiter; *Gastrointestinal*: bowel irregularity, constipation aggravated, dyspepsia, dysphagia, dysplasia GI, epigastric pain, eructation, esophageal disorder, frequent stools, gastroenteritis, GI hemorrhage, GI symptoms not otherwise specified, hiccup, melena, mouth disorder, pharynx disorder, rectal disorder, serum gastrin increased, tongue disorder, tongue edema, ulcerative stomatitis, vomiting; *Hearing*: earache, tinnitus; *Hematologic*: anemia, anemia hypochromic, cervical lymphoadenopathy, epistaxis, leukocytosis, leukopenia, thrombocytopenia; *Hepatic*: bilirubinemia, hepatic function abnormal, SGOT increased, SGPT increased; *Metabolic/Nutritional*: glycosuria, hyperuricemia, hyponatremia, increased alkaline phosphatase, thirst, vitamin B12 deficiency, weight increase, weight decrease; *Musculoskeletal*: arthralgia, arthritis aggravated, arthropathy, cramps, fibromyalgia syndrome, hernia, polymyalgia rheumatica; *Nervous System/Psychiatric*: anorexia, apathy, appetite increased, confusion, depression aggravated, dizziness, hypertonia, nervousness, hypoesthesia, impotence, insomnia, migraine, migraine aggravated, paresthesia, sleep disorder, somnolence, tremor, vertigo, visual field defect; *Reproductive*: dysmenorrhea, menstrual disorder, vaginitis; *Respiratory*: asthma aggravated, coughing, dyspnea, larynx edema, pharyngitis, rhinitis, sinusitis; *Skin and Appendages*: acne, angioedema, dermatitis, pruritus, pruritus ani, rash, rash erythematous, rash maculo-papular, skin inflammation, sweating increased, urticaria; *Special Senses*: otitis media, parosmia, taste loss, taste perversion; *Urogenital*: abnormal urine, albuminuria, cystitis, dysuria, fungal infection, hematuria, micturition frequency, moniliasis, genital moniliasis, polyuria; *Visual*: conjunctivitis, vision abnormal.

Endoscopic findings that were reported as adverse events include: duodenitis, esophagitis, esophageal stricture, esophageal ulceration, esophageal varices, gastric ulcer, gastritis, hernia, benign polyps or nodules, Barrett's esophagus, and mucosal discoloration.

APPEARS THIS WAY
ON ORIGINAL

33

The incidence of treatment-related adverse events during 6-month maintenance treatment was similar to placebo. There were no differences in types of related adverse events seen during maintenance treatment up to 12 months compared to short-term treatment.

Two placebo-controlled studies were conducted in 710 patients for the treatment of symptomatic gastroesophageal reflux disease. The most common adverse events that were reported as possibly or probably related to NEXIUM were diarrhea (4.3%), headache (3.8%), and abdominal pain (3.8%).

Other adverse events not observed with NEXIUM, but occurring with omeprazole can be found in the omeprazole package insert, ADVERSE REACTIONS section.

**Combination Treatment with Amoxicillin and Clarithromycin**
In clinical trials using combination therapy with NEXIUM plus amoxicillin and clarithromycin, no adverse events peculiar to these drug combinations were observed. Adverse events that occurred have been limited to those that had been observed with either NEXIUM, amoxicillin, or clarithromycin alone.

The most frequently reported drug-related adverse events for patients who received triple therapy for 10 days were diarrhea (9.2%), taste perversion (6.6%), and abdominal pain (3.7%). No treatment-emergent adverse events were observed at higher rates with triple therapy than were observed with NEXIUM alone.

For more information on adverse events with amoxicillin or clarithromycin, refer to their package inserts, ADVERSE REACTIONS sections.

APPEARS THIS WAY
ON ORIGINAL

34

## Laboratory Events

The following potentially clinically significant laboratory changes in clinical trials, irrespective of relationship to NEXIUM, were reported in ≤ 1% of patients: increased creatinine, uric acid, total bilirubin, alkaline phosphatase, ALT, AST, hemoglobin, white blood cell count, platelets, serum gastrin, potassium, sodium, thyroxine and thyroid stimulating hormone (see CLINICAL PHARMACOLOGY, *Endocrine effects* for further information on thyroid effects). Decreases were seen in hemoglobin, white blood cell count, platelets, potassium, sodium, and thyroxine.

In clinical trials using combination therapy with NEXIUM plus amoxicillin and clarithromycin, no additional increased laboratory abnormalities particular to these drug combinations were observed.

For more information on laboratory changes with amoxicillin or clarithromycin, refer to their package inserts, ADVERSE REACTIONS section.

## OVERDOSAGE

A single oral doses of esomeprazole at 510 mg/kg (about 103 times the human dose on a body surface area basis), was lethal to rats. The major signs of acute toxicity were reduced motor activity, changes in respiratory frequency, tremor, ataxia, and intermittent clonic convulsions.

APPEARS THIS WAY
ON ORIGINAL

35

There have been no reports of overdose with esomeprazole. Reports have been received of overdosage with omeprazole in humans. Doses ranged up to 2,400 mg (120 times the usual recommended clinical dose). Manifestations were variable, but included confusion, drowsiness, blurred vision, tachycardia, nausea, diaphoresis, flushing, headache, dry mouth, and other adverse reactions similar to those seen in normal clinical experience (see omeprazole package insert - ADVERSE REACTIONS). No specific antidote for esomeprazole is known. Since esomeprazole is extensively protein bound, it is not expected to be removed by dialysis. In the event of overdosage, treatment should be symptomatic and supportive.

As with the management of any overdose, the possibility of multiple drug ingestion should be considered. For current information on treatment of any drug overdose, a certified Regional Poison Control Center should be contacted. Telephone numbers are listed in the Physicians' Desk Reference (PDR) or local telephone book.

## DOSAGE AND ADMINISTRATION

The recommended adult dosages are outlined in the table below. NEXIUM Delayed-Release Capsules should be swallowed whole and taken at least one hour before eating.

For patients who have difficulty swallowing capsules, one tablespoon of applesauce can be added to an empty bowl and the NEXIUM Delayed-Release Capsule can be opened, and the pellets inside the capsule carefully emptied onto the applesauce. The pellets should be mixed with the applesauce and then swallowed immediately. The applesauce used should not be hot and should be soft enough to be swallowed without chewing. The pellets should not be chewed or crushed. The pellet/applesauce mixture should not be stored for future use.

APPEARS THIS WAY
ON ORIGINAL

36

The pellets have also been shown *in vitro* to remain intact when exposed to tap water, orange juice, apple juice and yogurt.

**Recommended Adult Dosage Schedule of NEXIUM**

| Indication | Dose | Frequency |
|---|---|---|
| **Gastroesophageal Reflux Disease (GERD)** | | |
| Healing of Erosive Esophagitis | 20 mg or 40 mg | Once Daily for 4 to 8 Weeks* |
| Maintenance of Healing of Erosive Esophagitis | 20mg | Once Daily** |
| Symptomatic Gastroesophageal Reflux Disease | 20 mg | Once Daily for 4 Weeks*** |
| ***H. pylori* Eradication to Reduce the Risk of Duodenal Ulcer Recurrence** | | |
| *Triple Therapy:* | | |
| NEXIUM | 40 mg | Once Daily for 10 Days |
| Amoxicillin | 1000 mg | Twice Daily for 10 Days |
| Clarithromycin | 500 mg | Twice Daily for 10 Days |

APPEARS THIS WAY
ON ORIGINAL

37

<sup>1</sup>(see **CLINICAL STUDIES**). The majority of patients are healed within 4 to 8 weeks. For patients who do not heal after 4-8 weeks, an additional 4-8 weeks of treatment may be considered.

<sup>**</sup>Controlled studies did not extend beyond six months.

<sup>***</sup>If symptoms do not resolve completely after 4 weeks, an additional 4 weeks of treatment may be considered.

Please refer to amoxicillin and clarithromycin full prescribing information for **CONTRAINDICATIONS, WARNINGS** and dosing in elderly and renally-impaired patients.

**Special Populations**
*Geriatric:* No dosage adjustment is necessary.  (See CLINICAL PHARMACOLOGY, **Pharmacokinetics.**)

*Renal Insufficiency:* No dosage adjustment is necessary.  (See CLINICAL  **PHARMACOLOGY, Pharmacokinetics.**)

*Hepatic Insufficiency:* No dosage adjustment is necessary in patients with mild to moderate liver impairment (Child Pugh Classes A and B). For patients with severe liver impairment (Child Pugh Class C), a dose of 20 mg of NEXIUM should not be exceeded (See CLINICAL **PHARMACOLOGY, Pharmacokinetics.**)

*Gender:* No dosage adjustment is necessary.  (See CLINICAL PHARMACOLOGY, **Pharmacokinetics.**)

**HOW SUPPLIED**

NEXIUM Delayed-Release Capsules. 20 mg. are opaque, hard gelatin, amethyst colored capsules with two radial bars in yellow on the cap and 20 mg in yellow on the body. They are supplied as follows:

NDC 0186-5020-31 unit of use bottles of 30

38

NDC 0186-5022-28 unit dose packages of 100
NDC 0186-5020-54 bottles of 90
NDC 0186-5020-68 bottles of 100
NDC 0186-5020-82 bottles of 1000

NEXIUM Delayed-Release Capsules, 40 mg, are opaque, hard gelatin, amethyst colored capsules with three radial bars in yellow on the cap and 40 mg in yellow on the body. They are supplied as follows:

NDC 0186-5040-31 unit of use bottles of 30
NDC 0186-5042-28 unit dose packages of 100
NDC 0186-5040-68 bottles of 100
NDC 0186-5040-82 bottles of 1000

**Storage**
Store at 25°C (77°F); excursions permitted to 15 - 30°C (59 - 86°F). [See USP Controlled Room Temperature]. Keep container tightly closed. Dispense in a tight container if the product package is subdivided.

**REFERENCES**

1. National Committee for Clinical Laboratory Standards. Methods for Dilution Antimicrobial Susceptibility Tests for Bacteria That Grow Aerobically. Fifth Edition: Approved Standard NCCLS Document M7-A5, Vol. 20, no. 2, NCCLS, Wayne, PA, January 2000.

Issued date to be placed here

39

All trademarks are the property of the AstraZeneca group

© AstraZeneca 2001

Manufactured for:
AstraZeneca LP
Wilmington, DE 19850
By: AstraZeneca AB
Sodertalje, Sweden

Product of France

Rev. 02/01

AstraZeneca

40

**Copies to:**

Michael D. Hausfeld (D.C. Bar No. 153742)
Brian A. Ratner (D.C. Bar No. 473284)
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Ave., N.W.
Washington, D.C. 20005

Linda P. Nussbaum, D.C.
Steig D. Olson
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, New York 10022

Joseph M. Vanek
David Germaine
Vanek, Vickers & Masini, P.C.
225 W. Washington 18th Floor
Chicago, IL  60606

Paul E. Slater
Sperling & Slater, P.C.
55 W. Monroe Street, Suite 3300
Chicago, IL 60603

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this 6th day of April, 2007, served a true and correct copy of the foregoing on counsel of record in this proceeding, by electronic means, as well as on all counsel listed below by United States mail, properly addressed and first class postage prepaid.


_____/S/Mark E. Haddad_____
Mark E. Haddad

Michael D. Hausfeld (D.C. Bar No. 153742)
Brian A. Ratner (D.C. Bar No. 473284)
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Ave., N.W.
Washington, D.C. 20005

Linda P. Nussbaum, D.C.
Steig D. Olson
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, New York 10022

Joseph M. Vanek
David Germaine
Vanek, Vickers & Masini, P.C.
225 W. Washington 18th Floor
Chicago, IL  60606

Paul E. Slater
Sperling & Slater, P.C.
55 W. Monroe Street, Suite 3300
Chicago, IL 60603

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Meijer, Inc. and Meijer Distribution, Inc.,           :
                                                       :
                    Plaintiffs,                        :
                                                       :
                                                       :    Civil Case Number:
              v.                                       :    1:06-cv-02155-RWR
                                                       :
AstraZeneca Pharmaceuticals L.P.;                      :
AstraZeneca L.P.; Zeneca, Inc.;                        :
and Zeneca Holdings, Inc.,                             :
                                                       :
                    Defendants.                        :
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**ORDER**

Upon consideration of the Motion to Dismiss of Defendants AstraZeneca

Pharmaceuticals LP, AstraZeneca LP, Zeneca Inc., and Zeneca Holdings, Inc. (collectively

"AstraZeneca"), Plaintiffs' opposition(s), and AstraZeneca's reply, it is hereby

ORDERED that AstraZeneca's Motion to Dismiss is GRANTED; and it is further

ORDERED that the complaints filed by Plaintiffs in the above-captioned actions

are DISMISSED with prejudice.

_____          _____
DATE                                                Richard W. Roberts
                                                 United States District Judge